**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Roland Errol BROCK, Defendant-Appellant.**

**No. 77–1679.**

United States Court of Appeals, Ninth Circuit.

March 3, 1978.

David M. Heller, Asst. Federal Defender (argued), Phoenix, Ariz., for defendant-appellant.

Kenneth L. Fields, Asst. U. S. Atty. (argued), Phoenix, Ariz., for plaintiff-appellee.

Before BROWNING and HUFSTEDLER, Circuit Judges, and EAST, District Judge.*

EAST, District Judge:

*Conviction and Appeal:*

Roland Errol Brock (Brock) appeals from a court trial conviction and sentence to custody entered by the District Court for violation of 18 U.S.C. § 1542 (false statement in a passport application). We affirm.

*Issues:*

Brock contends the District Court erred in denying his motion to suppress the fruits of a state search for the reason the state search warrant was issued without probable cause. Brock further asserts the search was undertaken to locate evidence relating to a federal crime without probable cause to believe that a federal crime had been committed.

*Facts:*

In February, 1975, the Federal Bureau of Investigation (FBI) began a "false identification investigation" regarding the use of the name "Edward Joseph Zupancic." Special Agent Durr's attention was directed to Brock and in the course of his investigation discovered that the San Diego Police Department was also investigating Brock for the murder of Charles Britell, whose body had been found in the Arizona desert on March 12, 1975. On March 19, Durr accompanied a San Diego policeman and an officer from Arizona to Brock's hotel room. Brock identified himself as "Ron Soubya" and refused consent to a search of the room without a warrant. Brock was taken into custody and detained at the police station while a search warrant for, *inter alia,* driver's licenses, birth certificates, cancelled mail envelopes, and other identification cards was obtained from the San Diego Municipal Court upon the affidavit of Officer Tague of the San Diego Police Department.

The state police had previously learned from Britell's fiancee that Britell normally carried various types of identification with him; yet when the body was discovered, no such identification was found. Manifestly, the police were seeking such evidence in an effort to link Brock with the murder. Officer Tague's affidavit set forth the factual basis for his belief that evidence relating to Britell's murder would be found in Brock's hotel room. Essentially it alleged facts that could reasonably support a conclusion that Britell left San Diego heading east with Brock on March 3, 1975; that Britell was shot on or before March 12, 1975; and that some of the victim's personal effects were taken by the killer. The affidavit also

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

stated that "I have been a police officer for the past 15 years and am presently assigned to the Homicide Division of the San Diego Police Department and have been so assigned for the past two years. I have investigated in excess of 300 crimes of violence. Because of my training and experience in this area of criminal activity, I know that persons who may have murdered other persons with a firearm and when the victim is shown to be missing property that the suspect may very probably has [sic] concealed said firearm and/or property in amongst [sic] his personal property which is left in his residence or place of abode. It is my opinion that the aforementioned property will be found in the aforementioned premises."

Durr testified, without contradiction, that he was not involved in the procurement of the warrant in any way; he never sought a warrant nor did he advise Officer Tague as to what should go into the affidavit.

Upon issuance of the search warrant, the state police with Durr present conducted a search of Brock's hotel room. The state search revealed none of the items of evidence designated in the search warrant; however, a money order or receipt for a passport application in the name of Zupancic and other related papers were discovered. Durr questioned Brock about the papers and Brock made what he characterized as "introductory remarks." However, the record before us is silent as to the content of those remarks.

The following day Brock, unsolicited by any federal officer, voluntarily appeared at the San Diego FBI office. There is no evidence in the record that Brock was taken into custody or in any way restrained from leaving the office. Brock indicated he wished to talk about the matter. In the presence of another FBI agent, Durr advised Brock of his *Miranda* rights. Thereupon Brock waived the *Miranda* opportunities and admitted to the making of a false passport application in the name of Zupancic and gave other details of the procedures taken in seeking a return to Japan under a false name.

At trial, Durr testified as to Brock's admissions of his purpose for returning to Japan under a false name, his knowledge of Zupancic's birth and death certificates, and his official application for a passport under the false name of Zupancic. In addition, the Government presented in evidence five documents:

(1) Brock's original application for a passport in the name of Zupancic;

(2) A third party affidavit of identification of Zupancic;

(3) A certified copy of Zupancic's birth certificate;

(4) A certified copy of Zupancic's death certificate; and

(5) A form of the *Miranda* rights as read to Brock by Durr.

We here emphasize that none of the documents received in evidence were seized under the state search warrant.

*Discussion and Conclusions:*

We are satisfied it is unnecessary for us to here meet either of the issues of whether:

(a) Probable cause existed for the issuance of the state search warrant;[1] or

---

1. This Court has held that an affidavit may be sufficient to support the issuance of a search warrant

"even though 'the nexus between the items to be seized and the place to be searched rested not on direct observation, as in the normal search-and-seizure case, but on the type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely' to conceal the property sought. *United States v. Lu-*

*carz,* 430 F.2d 1051, 1055 (9th Cir. 1970)." *United States v. Bowers,* 534 F.2d 186, 192 (9th Cir.), *cert. denied,* 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976).

*See also Chin Kay v. United States,* 311 F.2d 317, 320 (9th Cir. 1962).

When probable cause is based on such factors, *Bowers* and *Lucarz* appear to suggest there must additionally be sufficient grounds to establish probable cause to arrest the suspect whose premises are searched.

(b) The state search was undertaken to locate evidence of a federal crime.[2]

█ We express no opinion as to those issues because we conclude an appropriate disposition of Brock's appeal rests on other grounds.[3]

Brock tacitly concedes that none of the evidence submitted at trial by the Government was seized under the state search warrant; nevertheless he argues all such evidence was tainted fruit of the illegal search. We disagree.

█ We assume, *arguendo,* that the seizure of the money order or receipt for a passport application in the name of Zupancic was illegal. Nevertheless it is manifest from the record the only possible linkage between the information gathered by Durr at the search and the evidence produced at trial was Brock's subsequent appearance at the FBI office and the subsequent incriminating statements. The record is silent as to that aspect and we decline to surmise that Brock's actions and incriminating statements were taken and given under any governmental intimidation or duress by reason of Durr's presence at the state search. Rather we believe that Brock freely and voluntarily called at the FBI office and, after hearing the *Miranda* rights, he freely and voluntarily made his incriminating statements.

The Supreme Court teaches that information obtained through an unconstitutional search does not "become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others . . . ." *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Later the Supreme Court said in *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963):

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' "

Durr testified on direct examination at trial, without contradiction, that Brock was under federal investigation prior to the state search for attempting to gain a false identification and that the FBI was aware of the alias being used by Brock, that routine FBI procedure in a false identification investigation included inquiry of the passport office, and finally, that such inquiry was routinely made here.[4] Hence, an inde-

---

**2.** In *United States v. Honore,* 450 F.2d 31 (9th Cir. 1971), *cert. denied,* 404 U.S. 1048, 92 S.Ct. 728, 30 L.Ed.2d 740 (1972), during a search conducted pursuant to a warrant, the officer came across and seized some unlisted license plates. The officer had prior knowledge from the FBI that one of the occupants of the premises searched was suspected of the federal crime of armed robbery. The seizure was upheld "even though they [the evidence] were not specified in the warrant and were not related to the crime which underlay the search warrant." *Id.* at 33. Here, too, the state officers had prior knowledge that the FBI was investigating Brock as to a federal crime.

**3.** "This Court may affirm on any ground squarely presented on the record." *Jacobson v. Tahoe Regional Planning Agency,* 558 F.2d 928, 939 n. 17 (9th Cir. 1977).

**4.** "Q Now, before this search warrant was issued, you were involved in a passport application investigation, is that correct?

A We were involved with a false identification investigation regarding this case, yes.

Q Regarding Mr. Brock?

A We were investigating regarding a person using the name of 'Edward J. Zupancic.'

. . . . .

Q And you suspected, however, that this defendant was, in fact, the person you were investigating?

A Yes, sir, we did. [R.T. 10:5–18]."

Further testimony on direct and redirect reveals that through ordinary investigative procedures, inquiry would have been and was made of the passport office regarding the use of the false name "Zupancic."

"Q Mr. Durr, I would ask you now how it was that you came—Did you ever come to the information that a passport had, in fact, been applied for in the name of Zupancic

pendent source existed for the acquisition of the documents in question. Whether the officers first learned of the possibility of the passport application from the search is not solely determinative. Rather, the crucial factor is whether the tainted information contributed to the discovery of the proffered evidence. We hold that it did not.

This Court in *United States v. Bacall,* 443 F.2d 1050 (9th Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971), was faced with an investigation in which illegal activity resulted in information that led to the evidence sought to be suppressed, and stated at 1056–57:

> "[I]f the illegally obtained leads were so insubstantial that their role in the discovery of the evidence sought to be suppressed 'must be considered *de minimis,*' then suppression is inappropriate. *Durham v. United States, supra,* [9 Cir.], 403 F.2d [190] at 196. *See McGarry v. United States,* 1 Cir., 1967, 388 F.2d 862, 871. Where the investigation that led to the controverted evidence 'was not intensified by reason of any tainted information,' the case for suppression is again weaker. *United States v. Schipani, supra,* 414 F.2d [1262] at 1266."

We hold that the documents and statements were properly admitted because of the "independent source" of Durr's investigative channels and because any "connection between the [search] and [Brock's] statement had 'become so attenuated as to dissipate the taint.'" *Wong Sun,* 371 U.S. at 491, 83 S.Ct. at 419, quoting from *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Further, if the search contributed in any degree to Brock's incriminating statements to the FBI agents, its role was *de minimis. Bacall.*

The judgment of conviction and sentence entered by the District Court on March 14, 1977 is affirmed.

AFFIRMED.

other than through Brock, a conversation you had with him?
A  Yes, sir, we did.  Our procedure for conducting investigations regarding false identification are that we first—when a person attempts to establish or pick up the identity of a deceased, then our procedure is to conduct the agency checks, then in time write to our field office, Washington, D. C., and have them check the U. S. Passport Office for any possible passports.
And we did, in fact, write to them and they, in turn, sent to us a Xerox copy of the passport application.  [R.T. 39:19–40:8].

Q  My question is, through your ordinary or routine investigative procedures, would you have come to this information?
MR. KLEINSCHMIDT:  Your Honor, I object. That is not material, not what happened in this case.
THE COURT:  Did you follow your routine procedures and secure information regarding the false application outside of the search?
THE WITNESS:  Yes, sir, I did.
THE COURT:  Was that after the search?
THE WITNESS:  Yes, sir, this was in this particular case, it was after the search.  [R.T. 41:1–14]."