**Rafael CUEVAS–ORTEGA and Josephina Del Toro-Mendoza, Petitioners,**

v.

**IMMIGRATION AND NATURALIZA-TION SERVICE, Respondent.**

No. 77–1630.

United States Court of Appeals, Ninth Circuit.

Jan. 2, 1979.

Bill Ong Hing, San Francisco, Cal., for petitioners.

Lawrence W. Chamblee, Lauren S. Kahn, Washington, D. C., for respondent.

Before WRIGHT and CHOY, Circuit Judges, and SWEIGERT *, District Judge.

CHOY, Circuit Judge:

Petitioners Rafael Cuevas-Ortega and Josephina Del Toro-Mendoza appeal an order of the Board of Immigration Appeals (the Board) affirming a finding of deportability and denial of voluntary departure. We affirm.

I

In May, 1976, the Immigration and Naturalization Service (INS), in cooperation with the San Mateo County District Attorney, was conducting an investigation of possible

---

* The Honorable William T. Sweigert, Sr., United States District Judge for the Northern District of California, sitting by designation.

fraudulent home birth registrations by resident aliens.[1] During the course of this investigation it was discovered that three home birth registrations listed the address of the same apartment complex, and that two of these listed "Jose Cervantes" as father but at different addresses within the complex.

In following up this coincidence at petitioners' apartment complex, INS investigator Cornejo and an inspector from the District Attorney's office encountered approximately fifteen to twenty persons, each of whom was an illegal alien from Apatzingan, a town in the state of Michoacan, Mexico. It was at this point that the two investigators spoke with an apartment dweller who had signed one of the "Jose Cervantes" certificates as a witness. She stated that she thought the certificates were from two different families, and that the people who lived in petitioners' apartment were related to the Cervantes family whose certificate she hadn't signed.

The two investigators then went to petitioners' apartment where Del Toro answered their knock. After they identified themselves, Cornejo asked Del Toro whether she knew the family listed on the suspect certificate. She replied that she did not know too much about them, but that she knew the neighbor who had directed the investigators to her apartment. Cornejo then asked Del Toro whether she was from Michoacan and she replied "Yes"; and when he asked her if she was in the United States illegally she also answered "Yes."

After permitting the investigators inside the apartment, Del Toro admitted in response to questions that her husband and five of their six children were also illegal aliens. Cornejo instructed Del Toro to come to the INS office with her husband and identification documents.

Petitioners went to the INS office at the appointed time on May 4, 1976, and told Cornejo that petitioner Cuevas had entered the United States surreptitiously in June, 1973, and that Cuevas then had Del Toro and their five children smuggled into the United States from Mexico in September, 1974. These admissions were contemporaneously recorded on two I–213 forms (Record of Deportable Alien).

At their deportation hearing, petitioners refused to testify on advice of counsel. The I–213 forms were introduced, over the objection of petitioners' attorney, to establish deportability. The immigration judge rejected the claim that the statements on the I–213 forms were the "fruits" of an illegal search and seizure at the initial apartment meeting. He ruled that it was therefore "immaterial what happened before that," and denied petitioners' motion for a continuance to produce the neighbor as a witness and prohibited further questioning of Cornejo concerning the investigation in the neighborhood. Petitioners were found deportable as charged. The immigration judge also denied their request for voluntary departure, noting that they had used a smuggler to bring in Del Toro and their five children, and that Cuevas had been arrested and fined for drunk driving after his illegal entry.

The Board found that the statements on the I–213 forms were "not unlawfully obtained" and held that the denial of voluntary departure was a proper exercise of discretion, and petitioners appeal.

## II

Petitioners first argue that the initial questioning of Del Toro violated their fourth amendment rights.[2] We disagree. The two investigators neither searched nor seized anything or anyone.

---

1. The purpose of the investigation was to determine whether the births actually occurred in the United States, since prior to a 1976 statutory amendment aliens who gave birth to a child in the United States were thereby exempted from the requirement of labor certification under 8 U.S.C. § 1182(a)(14).

2. Petitioners have stated their objection to the initial questioning of Del Toro by characterizing it as a "seizure" of her person and her conversation, rather than as a coerced statement violative of the fifth amendment. *See* Part II *infra*.

They merely knocked on petitioners' door to ask whoever answered for information about home birth registrations. Del Toro answered the door and, after the investigators identified themselves, spoke with them over the threshold. During the conversation and subsequently, she freely admitted that she, her husband and five of their children were illegal aliens. Del Toro was under no constraint to invite or allow the investigators into the apartment. There was no arrest, custody or curtailment of liberty.[3] *Cordon de Ruano v. INS*, 554 F.2d 944, 946 (9th Cir. 1977). As stated in *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the fourth amendment becomes relevant to an encounter between an official and a person only when the official restrains the person's freedom to walk away—an act the Court denominated a "seizure of the person." Moreover, the Court expressly noted that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Id.* at 19 n.16, 88 S.Ct. at 1879 n.16. Here, Del Toro was entirely free to close the door on the investigators. As long as she was willing to talk to them, there was no seizure of her person.

Nor was Del Toro's conversation illegally "searched" or "seized." She willingly spoke with the investigators both at her door and once they were inside. Just as there is no "search" involved when an officer observes that which is clearly and plainly to be seen, *Chapman v. United States*, 346 F.2d 383, 387 (9th Cir.), *cert. denied*, 382 U.S. 909, 86 S.Ct. 249, 15 L.Ed.2d 161 (1965), there is no

"search" or "seizure" when an officer listens to that which he is freely told. The investigators did not take anything, but merely talked with Del Toro to the extent she was willing.

■ Therefore, we reject petitioners' claim that the initial contact violated the fourth amendment.[4]

### III

Petitioners next argue that their statements at the INS office were the illegal "fruits" of the initial contact, and that their appearance and statements at the office were involuntary and hence not purged of the taint of the initial illegality. Since we have determined that the initial contact did not violate the fourth amendment, we address only the issue of the voluntariness of the office statements.

■ Deportation proceedings must conform to traditional standards of fairness encompassed in due process; and accordingly, statements made by an alien used to support deportation must be voluntarily made. *Choy v. Barber*, 279 F.2d 642, 646 (9th Cir. 1960). We have previously noted that the civil rather than criminal nature of deportation proceedings renders the analysis of voluntariness in such situations markedly different from that in the criminal context. *Trias-Hernandez v. INS*, 528 F.2d 366, 368–69 (9th Cir. 1975). In particular, since it is the alien's burden to show lawful entry,[5] since he must answer non-incrimina-

---

**3.** In contrast, a non-border stop or detention to question a suspected illegal alien about his citizenship requires "reasonable suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–84, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), aff'g, 499 F.2d 1109 (9th Cir. 1974) (en banc); *United States v. Avalos-Ochoa*, 557 F.2d 1299, 1301 (9th Cir. 1977); *see Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1070 (7th Cir. 1976), modified, 548 F.2d 715 (1977) (en banc); *Au Yi Lau v. INS*, 144 U.S.App.D.C. 147, 445 F.2d 217, 223 (D.C. Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971). *But cf. United States v Martinez-Fuerte*, 428 U.S. 543, 556–57, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)

(routine stopping of cars at permanent Border Patrol checkpoint does not require reasonable suspicion).

**4.** Since the encounter between petitioner Del Toro and the investigators did not rise to the level of a "seizure of the person" requiring reasonable suspicion, the immigration judge's denial of a continuance to obtain the neighbor as a witness and his limitation of further questioning of Cornejo concerning the investigation in the neighborhood did not constitute an abuse of discretion.

**5.** *See* 8 U.S.C. § 1361; *Trias-Hernandez v. INS*, 528 F.2d 366, 368 (9th Cir. 1975).

ting questions,[6] since his silence may be used against him,[7] and since his statements are admissible despite lack of counsel,[8] it is more likely than not that the alien will freely answer the government agent's questions. *See id.* Thus, where there is nothing in the record indicating that the alien's statement was induced by coercion, duress, or improper action on the part of the immigration officer, and where the petitioner introduces no such evidence, the bare assertion that a statement is involuntary is insufficient. *Ben Huie v. INS,* 349 F.2d 1014, 1017 (9th Cir. 1965).

In this case, Cornejo told petitioner Del Toro to come to the INS office on a particular date and to bring her husband and identification papers. Petitioners went to his office and made the statements that were recorded on the I–213 forms. There was no testimony or evidence presented by petitioners at the hearing to establish that the statements at the office were involuntary.

▮ Therefore, we affirm the finding of the Board that the office statements were not unlawfully obtained.[9]

### IV

Petitioners contend that the evidence which established their deportability is excludable as the "fruit" of an illegal search and seizure. Having rejected the contention that a fourth amendment violation occurred, we do not reach this exclusionary rule issue.

### V

▮ Petitioners finally argue that in the alternative, they should have been granted voluntary departure. Once the statutory prerequisites have been met, *see* 8 U.S.C. § 1254(e), the issue of whether to permit an admittedly deportable alien to depart voluntarily is a matter wholly within the discretion of the Attorney General or his delegate. *See id.;* 8 C.F.R. §§ 244.1–.2; *Fugiani v. Barber,* 261 F.2d 709, 711–12 (9th Cir. 1958). On review, this Court may examine only whether discretion was actually exercised and whether the manner in which it was exercised was arbitrary or capricious. *See Fernandez-Gonzalez v. INS,* 347 F.2d 737, 740 (7th Cir. 1965).

▮▮ The alien has the burden of proof to establish that he is eligible for voluntary departure. *Trias-Hernandez v. INS,* 528 F.2d 366, 370 (9th Cir. 1975). One of the statutory requirements for voluntary departure, which the alien bears the burden of proving, is that he has been of good moral character for at least five years preceding his application. Petitioners here presented nothing to sustain this burden. On the contrary, it was shown that petitioner Cuevas had entered the country surreptitiously and paid for a smuggler to get petitioner Del Toro and five children into the United States. He had also been arrested and fined for drunk driving. Petitioner Del Toro also deliberately endeavored to avoid the immigration laws. In the absence of any affirmative showing of good moral character, we conclude that it was not an abuse of discretion for the immigration judge to deny voluntary departure.

Since we find that the deportation order is supported by reasonable, substantial and probative evidence on the record as a whole, *see* 8 U.S.C. § 1105a(a)(4); *Woodby v. INS,* 385 U.S. 276, 281–84, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966); *Espinoza-Espinoza v. INS,* 554 F.2d 921, 924 (9th Cir. 1977), and that the denial of voluntary departure was a proper exercise of discretion, the judgment of the Board of Immigration Appeals is

AFFIRMED.

---

6. *See Chavez-Raya v. INS,* 519 F.2d 397, 402 (7th Cir. 1975).

7. *See id.* at 401.

8. *See Lavoie v. INS,* 418 F.2d 732, 734 (9th Cir. 1969); *Nason v. INS,* 370 F.2d 865, 867–68 (2d Cir. 1967); *Pang v. INS,* 368 F.2d 637, 639 (3d Cir. 1966).

9. Moreover, since the office statements were voluntary, even if the initial questioning was unlawful it would not render invalid the deportation proceeding based on the subsequent voluntary statements. *Mendina-Sandoval v. INS,* 524 F.2d 658, 659 (9th Cir. 1975).