UNITED STATES of America,
Plaintiff-Appellant,

v.

Dora Correa PATINO,
Defendant-Appellee.

No. 79–1710.

United States Court of Appeals,
Ninth Circuit.

Argued April 17, 1980.

Submitted Aug. 22, 1980.

Decided June 29, 1981.

William M. Goodman, San Francisco, Cal., for defendant-appellee.

Joseph M. Burton, Asst. U. S. Atty., San Francisco, Cal., for the United States.

Before HUG, SCHROEDER and PREGERSON, Circuit Judges.

HUG, Circuit Judge:

The essential issue in this case is whether the initial contact by the police with Dora Patino in the Miami airport constituted a seizure invoking the protection of the fourth amendment. The Government appeals from an order suppressing evidence which the court found was derived from a "seizure" of the person of Dora Patino without reasonable suspicion that she was engaged in unlawful activity. The princi-

pal evidence in question is a quantity of cocaine discovered in her suitcase. On appeal the Government contends that Patino's encounter with the police was voluntary and did not constitute a fourth amendment seizure; the Government does not contend that reasonable suspicion justified the encounter. A secondary issue is whether, assuming an unlawful seizure, the discovery of the cocaine was the result of independent investigative efforts untainted by the seizure.

Dora Patino was indicted for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Patino filed a motion to suppress evidence alleging that the seven pounds of cocaine retrieved from her suitcase by narcotics agents was obtained in violation of her fourth amendment rights. In her motion to suppress, Patino argued that she was seized unlawfully when she was stopped and questioned by narcotics investigators at the Miami airport without reasonable suspicion of unlawful activity, and that the evidence in question was tainted because it had been obtained as a result of information derived from the illegal stop. After an evidentiary hearing, the district court granted the motion to suppress. We affirm the district court findings that Patino was seized within the meaning of the fourth amendment and that the evidence was tainted.[1]

## I.

### Facts

John Facchiano, an investigator with the Drug Enforcement Agency (DEA), observed Patino enter the Miami airport and drag a suitcase to the National Airlines ticket counter. Facchiano stated that Patino drew his attention primarily because she appeared "nervous" and was "looking around, in a scanning fashion, at the airport, as if to be looking for someone, or to see if somebody was looking for her." Facchiano observed that Patino purchased her

ticket with cash, two one hundred dollar bills and a third bill of unknown denomination. Facchiano observed further that Patino continued to watch her suitcase after it was placed on the conveyor belt. Based on these observations, Facchiano decided to speak with Patino and attempt to obtain her consent to search the suitcase.

Facchiano summoned his partner, Charles McGee, and told him to monitor Patino as she walked around the airport. Facchiano then located Patino's suitcase in the baggage area, and noted that the name "Gloria Restrepo" appeared on the identification label. Facchiano asked the baggage supervisor to hold the suitcase until the last baggage cart departed for the flight about twenty minutes later. Facchiano told the baggage supervisor that he intended to talk with Patino and to obtain her consent to search the suitcase.

Facchiano returned to the terminal and rejoined his partner. Facchiano and McGee located Patino, approached her, announced that they were police officers, and displayed police identification. Patino stopped walking in response to the officers' statement and display of identification. At this point, Facchiano asked Patino "if she would mind speaking with [him] for a moment." Patino responded, "Yes, it would be okay." Facchiano then asked her if she would mind showing him her ticket and some identification. She was informed early in the conversation that she fit the profile characteristics of a female drug courier. In going through her wallet for identification, she was nervous and shaking. She produced an alien registration "green card" that bore the name "Dora Patino." Her nervousness increased when Facchiano asked again to see her airline ticket. Patino hesitated and then complied, and Facchiano observed that her ticket bore the name "Gloria Restrepo," which was the name on the suitcase. Having examined appellee's green card and plane ticket, Facchiano was aware that Pa-

---

1. In the suppression proceeding, the Government also contended that reasonable suspicion justified the stop. The district court found that the investigatory stop was not supported by

reasonable suspicion, as required by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Government on appeal does not contest this finding.

tino was travelling under another name. Patino explained the discrepancy in the names by stating that her cousin had made the reservation for her.

Facchiano then told her of the problems they had with contraband being taken through the Miami airport and asked Patino for her consent to search her cosmetic bag. She stated, "It's okay, you can look," and placed it on a counter and opened it. The bag contained only miscellaneous cosmetics` and no contraband. Facchiano then asked Patino if he could search the suitcase she had checked. When she asked the reason for the officer's search request, he again told her he was looking for narcotics. For the first time during the questioning, Facchiano advised Patino that she did not have to consent to the search. When she refused to consent, Facchiano called McGee aside and told him to summon a narcotics-detecting dog to examine Patino's suitcase. Facchiano and McGee decided to use the dog because of Patino's evasive answers and extreme nervousness.

Facchiano then continued his questioning. At this point, Patino requested the assistance of a Spanish-speaking officer to clarify what was occurring. Facchiano advised Patino for the first time that she was not required to answer further questions. Patino said she wished to leave, and was allowed to depart for her flight. The interview lasted approximately ten minutes.

Facchiano and McGee returned to the baggage area and arranged a suitcase lineup for the dog to sniff. The dog showed only a remote interest in Patino's suitcase, and neither the narcotics officers nor the dog handler considered the response to be a narcotics alert. Since a second dog was not readily available to make an additional test, the suitcase was released to the San Francisco flight.

On the basis of what Facchiano had learned during his questioning of Patino, he returned to the National Airlines counter, obtained the reservation call-back number for the Restrepo ticket, phoned that number, and was told that no one named Restrepo lived there. Facchiano then called local and federal narcotics officers stationed at San Francisco International Airport and advised those officers of the information he had obtained during his investigation of Patino in Miami, including all the information and observations that were developed during his questioning of her.

Patino deplaned in San Francisco and was observed by narcotics officers as she immediately walked out of the airport and entered a taxi without stopping for the suitcase she had checked in Miami. Two detectives confronted her, identified themselves, and asked her to return to the sheriff's substation in the airline terminal. She was told that the officers suspected her of narcotics trafficking. Approximately fifteen minutes after the detectives apprehended Patino, an investigator located her suitcase in the baggage area and arranged another suitcase lineup. The dog reacted positively to Patino's suitcase, indicating the presence of narcotics. Agents took the suitcase to the substation where Patino was being held, and told her of the information that had been provided by Facchiano and of the suitcase lineup results. A DEA agent advised Patino of her constitutional rights. She was told that a search warrant would be obtained to search the suitcase if she did not consent to such a search. Patino eventually signed a consent form, and the suitcase was opened. Investigators discovered, inside the suitcase, three packages which contained approximately seven pounds of cocaine. Patino was placed under arrest at that time.

## II.

### Seizure

■ The basic issue in this case is whether the initial action of the officers in stopping Patino and requesting her to produce her airline ticket and identification constituted a seizure within the meaning of the fourth amendment. The Government contends that Patino consented to this encounter, and thus, no seizure occurred. The essential inquiry is whether the person stopped reasonably believed that he or she

was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554–555, 100 S.Ct. 1870, 1877–1878, 64 L.Ed.2d 497, 509–10 (1980); *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Cuevas-Ortega v. INS*, 588 F.2d 1274, 1277 (9th Cir. 1979). We are not presented with a true question of consent, in the sense of an intentional waiver of a known right, for this would require knowledge on the part of the person that he or she was not required to stop or answer questions. This approach to fourth amendment rights was rejected in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Rather the inquiry is whether the act of remaining and answering questions was voluntary. *See* 2 W. LaFave, Search and Seizure 614–16 (1978). This is largely a factual inquiry dependent upon the totality of the circumstances, and we will defer to the finding of the district court unless it is clearly erroneous.

The judge did not enter written findings or conclusions but expressed them on the record in open court following the initial suppression hearing and following a motion for reconsideration. At the initial hearing, the argument principally concerned the question of whether reasonable suspicion of unlawful activity existed to justify the stop. The judge's remarks, at that time, were addressed to that issue. It was on the motion for reconsideration that the Government forcefully briefed and argued that Patino's encounter with the police was not a seizure invoking the protection of the fourth amendment.

The district judge, in ruling on the petition for reconsideration, found that the stop of Patino and the request to see her airline ticket and identification was a seizure because she would not reasonably have believed she was free to walk away. There are, of course, gradations of restraint. The most obvious would be when the officer physically restrains the person. Less restraint is involved when the officer simply tells the person that he or she is required to stay. Further down the scale, but still constituting restraint, is the situation when the officer merely indicates by his authoritative manner that the person is not free to leave.

In this case, the officers did not tell Patino that she had to stay and answer questions, and the words of the officers were phrased politely. There are, however, a number of facts that support the district court's finding that she was not free to walk away. She had a language problem, which is indicated by her request for a Spanish-speaking officer at one point in the interrogation. She was not told upon the initial encounter that she could refuse to stop and answer questions. Although, as we have noted, it is not essential that she have been told and that she understood that she could refuse, this is a factor that may be taken into consideration in determining whether she reasonably believed that she was free to leave. She was asked for her airline ticket and identification immediately upon being stopped, which could be taken as a show of authority.[2] Furthermore, the obvious knowledge on her part that this would reveal an inconsistency between the airline ticket and her identification would give rise to an inference that she would not willingly have produced them had she not felt obliged to do so.

This was not just a casual encounter with the police in the airport; the officers had definitely identified her as a suspect for investigation and the district judge could have considered that the manner in which she was stopped conveyed an air of authority indicating she was not free to leave. Moreover, she was an alien who may have felt a greater compulsion to abide by the request of the police.

It should be noted that we are really concerned with the initial confrontation and whether, at the time she was initially stopped and asked for her ticket and identification, she reasonably believed that she was not free to leave. After having seen the ticket and the identification, indicating that she was travelling under an assumed

**2.** Significance may be attached to a request for identification. *See Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), discussed in footnote 4 of this opinion.

name, there probably were sufficient articulable facts to create a reasonable suspicion justifying a brief detention for questioning.

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court recently considered whether an unlawful seizure had occurred in circumstances quite similar to this case. In that case, the DEA agents at the Detroit airport observed a passenger, deplaning from a flight originating in Los Angeles, whose conduct appeared to be characteristic of drug couriers. The agents approached her as she was walking through the concourse, identified themselves as federal agents, and asked to see her identification and airline ticket. The agents then questioned her briefly when they became aware of a discrepancy between the names indicated on her driver's license and her ticket. In these circumstances, strikingly similar to those presented in this case, Justices Stewart and Rehnquist concluded that Mendenhall was not seized within the meaning of the fourth amendment because she was free to disregard the questions and walk away, and thus there was no *Terry* requirement of reasonable suspicion, 446 U.S. at 546, 100 S.Ct. at 1873, 64 L.Ed. at 504 (opinion of Stewart, J.). The concurring justices did not reach the question of whether she had been seized, which they noted was an extremely close question, *id.* at 547, 100 S.Ct. at 1873, 64 L.Ed.2d at 513 n.1. They assumed that there was a seizure, but found that there was reasonable suspicion justifying the seizure, *id.* at 547, 100 S.Ct. at 1873, 64 L.Ed.2d at 513 (opinion of Powell, J.). The four dissenters concluded that Mendenhall was seized and found that the DEA agents lacked reasonable suspicion for the stop, *id.* at 566, 100 S.Ct. at 1883, 64 L.Ed.2d

at 517 (opinion of White, J.). Thus we have four justices who determined that there was a seizure, two who determined that there was not a seizure, and three who did not reach the question. *Mendenhall*, therefore, does not provide clear guidance for the disposition of this case. The district court in *Mendenhall* had not made a finding as to whether the defendant reasonably believed she was not free to leave.

■ Obviously not all contacts between the police and a member of the general public constitute stops invoking the protection of the fourth amendment. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.[3] The determination of when such a contact constitutes a seizure within the meaning of the fourth amendment depends upon the facts and circumstances of each case. Proper deference must be given to the district judge who heard the testimony of the officer, his tone of voice and inflection, and who observed the officer's conduct on the stand, his appearance and mannerisms. The district judge also observed the defendant in the courtroom. He is in the best position to evaluate the impression the defendant had when approached by the officers in the airport. We cannot say that the finding of the district judge that Patino reasonably believed she was not free to walk away was clearly erroneous.

The Government argues that the clearly erroneous standard is not applicable because the district judge applied an incorrect legal standard in making his determination. This argument is based upon the judge's comments concerning two cases cited and discussed by the parties in the briefs and argument on the petition for rehearing.[4] It

---

**3.** *Terry v. Ohio* unambiguously embraces the theory of consensual contacts. 392 U.S. at 19 n.16, 88 S.Ct. at 1879 ("Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").

**4.** The Government had relied upon the Fifth Circuit case of *United States v. Elmore*, 595

F.2d 1036 (5th Cir. 1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980). The defendant had contended this was implicitly overruled by the Supreme Court in *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357. The district judge indicated in his comments that he agreed with the defendant. Whether this assessment of the precedential effect of these two decisions was correct or incorrect does not affect the court's factual determination that Patino did not reasonably believe she was free to leave. However, be-

is apparent from the record, however, that the district judge did utilize the correct legal standard when he focused his inquiry upon whether Patino reasonably believed that she was not free to walk away. The factual record adequately supports his conclusion.

### III.

### *Taint*

The district court found that all of the evidence obtained after the stop was tainted by the unlawful seizure. The Government contends that, even assuming that the encounter with Patino was an unlawful seizure, the cocaine was obtained from independent, untainted sources that would have been explored regardless of the unlawful seizure. The Government does not claim that any of the other evidence such as the statements or observations of Patino would be untainted.

■ In *Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), the Supreme Court stated that:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of a primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

As we stated in *United States v. Chamberlin*, 644 F.2d 1262, 1268–1269 (9th Cir. 1980):

> The focus is on the causal connection between the illegality and the evidence; and, the burden of showing admissibility rests on the prosecution. *Dunaway* [*Dunaway v. New York*, 442 U.S. 200,] 99 S.Ct. [2248] at 2259 [60 L.Ed.2d 824]. In this circuit, we have stated the test to be whether the illegal activity tends to significantly direct the investigation to the evidence in question. *United States v. Cales*, 493 F.2d 1215 (9th Cir. 1975), *United States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971).

■ To support its claim that the evidence was obtained from independent sources that would have been explored regardless of the encounter, the Government relies heavily on the fact that Patino's suitcase had been set aside prior to the interview with the agents, and that Facchiano

cause of the importance placed upon these two decisions by the Government, we discuss them here.

The *Elmore* case involved an airport encounter where the officers stopped Elmore and asked for his airline ticket, and later, during the course of the conversation, asked for further identification. The lower court had held that no seizure occurred until the officer had walked away with his ticket to take it to the airline ticket counter. The circuit court upheld the finding of the lower court under the clearly erroneous standard. There is no indication that the circuit court would not have upheld a contrary finding under that standard.

In *Brown v. Texas* a police officer stopped a person and requested that he produce identification. A Texas statute authorized such stops and requests for identification without the justification of reasonable suspicion of criminal activity. The Supreme Court held that the detention and request for identification was a seizure within the meaning of the fourth amendment and that the statute was unconstitutional. The statute that authorized police to stop persons and require production of identification adds an automatic element of compulsion not present in *Elmore* or in this case. The Court in *Brown* did not hold that a stop and request for identification is necessarily a seizure. The *Brown* decision may place the *Elmore* decision in a different light. However, the question remains open, as is evidenced by the three opinions in *Mendenhall*.

The essential inquiry remains whether the person stopped reasonably believes he or she is not free to leave. This is basically a factual inquiry that must be evaluated under all of the circumstances. In the *Elmore* decision, the circuit court upheld the district court's determination under the clearly erroneous standard. The Supreme Court in *Brown* held that voluntary compliance is impossible in a situation where there is statutory compulsion to comply with a stop and request for identification. Both decisions are consistent with the focus of the inquiry of the district court in this case.

testified that he would have called the San Francisco airport to have the dogs sniff the suitcase, even if he had not spoken with Patino. However, there is a conflict in the record on this point. Facchiano also testified that if he had not been able to speak to Patino, he would have released her suitcase without further examination of it. In his investigative report filed on the same day of the encounter, Facchiano indicated that the information revealed in the encounter with Patino prompted him to have the dogs sniff the suitcase.[5] These facts distinguish *United States v. Brock*, 571 F.2d 480, 483–84 (9th Cir. 1978), where the uncontradicted evidence led the court to believe that routine, though post-search, investigatory procedures were an independent source of the contested evidence.

The district court resolved the conflict in the evidence against the Government when it ruled that the evidence was tainted. On the record as a whole, we cannot conclude that the district court was clearly erroneous in finding that the evidence was tainted. *See United States v. Brandon*, 467 F.2d 1008, 1011 (9th Cir. 1972). The information derived from the unlawful seizure of Patino—that she was extremely nervous, travelling under differing names, and did not want her suitcases searched—"tended to significantly direct" the investigation to the evidence in question.[6] Though Facchiano had set aside Patino's suitcase, and told the baggage supervisor that he intended to speak with Patino and get her consent to search the suitcase, the agents did not arrange the suitcase lineup for the dog to

5. The relevant portion of the investigative report provides as follows:

> [T]his writer and Officer McGee approached MS. PATINO displaying proper identification, and this writer asked if she would mind speaking with us for a moment. MS. PATINO stated, "Yes, it's okay."
>
> This writer then asked MS. PATINO if she would mind showing some type of identification. MS. PATINO became noticeably nervous and upon opening her purse, shook visibly about the hands. MS. PATINO extracted a wallet from her purse and attempted to locate some identification. MS. PATINO attempted to extract a green alien card from the portion of the wallet designated for photographs. MS. PATINO had to make several attempts to extract the card from the wallet, as she was shaking in such an unnatural manner. While taking the card from the wallet, Officer McGee noticed another alien card in the wallet. This was brought to MS. PATINO's attention and she stated that it was her daughter's. When the name observed on the alien card was different than that observed by this writer on the suitcase, this writer then asked MS. PATINO if she would mind showing us her airline ticket. MS. PATINO hesitated and then reached into her purse and extracted the airline ticket. The ticket was also under the name of MRS. G. RESTREPO. This writer then inquired as to the difference in names, and MS. PATINO stated that her cousin had made the reservation for her.
>
> This writer asked MS. PATINO if she was a resident of California or Miami, and she stated Miami. This writer then explained to MS. PATINO of the large problem of contraband being taken through the Miami International Airport. MS. PATINO responded by nodding her head and acted as though she understood. This writer then asked MS. PATINO if she would have any objections of allowing us to search her bag. MS. PATINO stated, "It's okay, you can look", and placed the cosmetic bag on the insurance counter and opened it. The bag contained only miscellaneous cosmetics.
>
> This writer then asked MS. PATINO if she would object to us searching the bag she was observed checking. MS. PATINO then inquired, "Why do you want to look in it?" This writer again explained the problem with contraband being carried in passenger's luggage, particularly narcotics. It must be noted that MS. PATINO was tremendously nervous. MS. PATINO responded, saying, "I don't think you should look in the bag." This writer advised MS. PATINO that this was her right and she could refuse to allow inspection.
>
> *Because of MS. PATINO's nervous state and obvious evasive answers to questions, Officer McGee departed and contacted the United States Customs narcotics dog unit, as there was some concern as to the contents of the checked piece of luggage.*
>
> (emphasis added).

6. This is information far in excess of the information, strictly pertaining to identity, found insufficient to taint subsequently discovered evidence in *United States v. Orozco-Rico*, 589 F.2d 433, 435 (9th Cir.), *cert. denied*, 440 U.S. 967, 99 S.Ct. 1518, 59 L.Ed.2d 783 (1979); *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir. 1978); and *United States v. Sand*, 541 F.2d 1370, 1376 (9th Cir. 1976), *cert. denied sub nom. Scully v. United States*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977).

sniff until after their encounter with Patino. It was during the interview with Patino, in fact, that Facchiano drew his partner aside and requested that a dog sniff be arranged. Furthermore, the record nowhere indicates that Facchiano, had he not spoken with Patino, would have investigated the reservation call-back number for the Restrepo ticket, an investigation occurring prior to his contacting the San Francisco authorities that undoubtedly increased his suspicions that Patino was a drug courier. *See United States v. Cales*, 493 F.2d 1215, 1215–16 (9th Cir. 1974); *United States v. Brandon*, 467 F.2d at 1010; *United States v. Bacall*, 443 F.2d 1050, 1057 (9th Cir.), *cert. denied*, 404 U.S. 1004, 92 S.Ct. 565, 30 L.Ed.2d 557 (1971). We therefore affirm the district court on the issue of taint.

AFFIRMED.