**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Steven Dale WINSOR,**
**Defendant-Appellant.**

**No. 86–5179.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 2, 1987.

Decided May 11, 1987.

Rehearing En Banc Granted
July 27, 1987.

George B. Newhouse, Jr., Los Angeles, Cal., for plaintiff-appellee.

Carlton F. Gunn, Los Angeles, Cal., for defendant-appellant.

Before SNEED, FARRIS and NOONAN, Circuit Judges.

SNEED, Circuit Judge:

Steven Winsor was convicted of possessing proceeds taken in a bank robbery, in violation of 18 U.S.C. § 2113(c). Alleging Fourth Amendment violations, he moved at trial to suppress certain evidence. The trial judge denied the motion. We affirm.

## I.

### FACTS

On January 14, 1986, Dennis Winsor—the appellant's brother—robbed the Mitsui Manufacturer's Bank in Hollywood, threatening to shoot a teller if she did not cooperate. A Los Angeles Police Department traffic officer followed the thief and saw

him disappear into a small two-story "residential hotel" near the bank. Additional police quickly arrived and received permission from the hotel manager to search for the suspect. Police Sergeant Moroney accompanied the search party. He had investigated five previous bank robberies in the neighborhood apparently perpetrated by the same individual and possessed a surveillance photograph taken during one of them. The photo showed a thief and a "lookout" man. The police obtained no search warrant.

The search progressed through the lobby and hallways of the hotel. At each room along the way, the officers knocked, identified themselves, and ordered the occupants to open their door. Eventually, the police knocked at the door to room 213, and Dennis Winsor answered. Sgt. Moroney instantly recognized him as the robber in the surveillance photo. Upon sight of the officers, Dennis Winsor stepped back into his room and away from the door. The police officers followed him in, guns drawn, and placed him under arrest.[1]

Also in the room was the appellant, Steven Winsor. As the police officers searched the Winsors' room, Officer Tuttle briefly questioned appellant, who refused to give the officer his name, claimed that he was carrying no identification, and denied knowing the other occupant of the room. Officer Tuttle told him that he would be taken down to the station for further questioning unless he began giving straight answers.

A few moments later, Sgt. Moroney approached appellant. He recognized him as the "lookout" in the surveillance photograph and ordered his arrest. Meanwhile, police continued to search the room, turning up several pieces of evidence, including stolen money. Once in custody, appellant made self-incriminating statements.[2]

Appellant contends that these facts make out both an unlawful search of his room and an unlawful seizure of his person. Therefore, he argues, the physical evidence

as well as his statements should have been suppressed. Although the circumstances of this case present difficult and unusual issues, we hold that the police did not violate the Fourth Amendment.

## II.

### ISSUES

Our discussion will focus on those aspects of police behavior that to us appear to be crucial in ascertaining whether there was an unlawful search or seizure. Because there is no basis upon which the appellant can challenge the presence of the police in the hallways of the hotel, our focus must be upon (1) the knock on the door of room 213, (2) the opening of the door of room 213, (3) the entry into room 213, (4) the search of room 213, and (5) the arrest of the appellant. However, before our discussion of these aspects of police behavior begins, it is necessary to address the government's contention that the "hot pursuit" doctrine justifies all relevant police conduct and that a more discerning analysis is not necessary.

## III.

### HOT PURSUIT

■ The government insists that "hot pursuit" by police of appellant's brother justified immediate entry into the hotel and any search thereof to find the felon. The district court accepted this position. We disagree. Hot pursuit may excuse police from the Fourth Amendment's warrant requirement, but never does it excuse the absence of the requisite degree of suspicion before effecting a search. *See United States v. Scott*, 520 F.2d 697, 700 (9th Cir.1975), *cert. denied*, 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976). In this case the district judge treated the ample cause to believe that the robber was in the hotel as ample cause to search each room in the hotel, including that of the Winsors.

---

1. Dennis Winsor subsequently pleaded guilty of bank robbery and is not before the court.

2. Police properly informed Winsor of his rights. His objections on appeal do not question the police behavior following the arrest.

This was improper. For the purposes of the Fourth Amendment, each room enjoys its own zone of protection from unreasonable searches and seizures. *See Scott*, 520 F.2d at 700. The police, upon going into the hotel, had probable cause to believe that the fleeing felon was in *a* room in the hotel; they lacked probable cause to believe that he was in any *particular* room.[3]

## IV.

### THE KNOCK ON THE DOOR

■ Appellant insists that the knock on the door of room 213 was itself a search unsupported by probable cause and thus violative of the Fourth Amendment. This is not the law. The Constitution permits one to "walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law." *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964), *quoted in United States v. Roberts*, 747 F.2d 537, 543 (9th Cir.1984). Merely by knocking, the police "neither searched nor seized anything or anyone." *Cuevas-Ortega v. INS*, 588 F.2d 1274, 1276 (9th Cir.1979).

A policeman knocking at one's door is analogous to investigatory encounters on the street or in airports. We recognize that the police may approach and question an individual without triggering Fourth Amendment scrutiny, so long as the person stops and answers voluntarily. *See United States v. Erwin*, 803 F.2d 1505, 1508 (9th Cir.1986). The individual's consent is a factual matter primarily to be determined in the district courts. *See id.; United States*

*v. Patino*, 649 F.2d 724, 727 (9th Cir.1981). Continuing the analogy, the knock by the police on a person's door is like their approach and questioning; the opening of the door is like the stop and answering of the person accosted. The test, like that in public area encounters, is whether the individual acted voluntarily.

## V.

### THE OPENING OF THE DOOR

#### 1. *Was the Door Opened Voluntarily?*

■ We conclude that here this test was not met. The door was not opened voluntarily. At the suppression hearing, policeman Tuttle testified that when knocking on the Winsors' door, the officers said: "Police. Open the door." It was also established that the police intended to enter the room even if no one answered.[4] We mention this fact because it may have contributed to the peremptoriness with which the officers spoke. In any event, the district judge found that the police had made a *"demand* that the occupants open the door," and that appellant's brother "opened the door *on command.*" Excerpt of Record (emphasis added). These factual findings are not clearly erroneous, and we must abide by them. Moreover, we believe that these findings prevent us from concluding that appellant's brother opened the door freely.

Compliance with a police "demand" is not consent. *See Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968); *United States v. Shepherd*, 714 F.2d 316, 318 n. 2 (4th Cir. 1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1914, 80 L.Ed.2d 462 (1984); *United States v. Berry*, 670 F.2d 583, 596 (5th Cir. Unit B

3. In addition, the district court held that the hotel manager's consent immunized the police conduct from constitutional attack. This too was error. A hotel proprietor cannot waive his guests' Fourth Amendment rights. *See Stoner v. California*, 376 U.S. 483, 489–90, 84 S.Ct. 889, 893–94, 11 L.Ed.2d 856 (1964). The manager did, however, have the authority to consent to the officers' presence in the common areas of the hotel.

4. The hotel manager had given the police a pass key and had "authorized" them to enter any room where no one responded to their knock.

As we have mentioned, the hotel manager had no authority to override the occupants' Fourth Amendment rights. *See supra* note 3. It is clear that if the police had entered the Winsors' room using this key, they would have violated the Constitution. They did not, however, do so. To the extent that the police unconstitutionally intruded on other occupants' rooms before reaching the Winsors, we express our strong disapproval of their conduct but note that appellant has no standing to object to it. *See Scott*, 520 F.2d at 699–700 & n. 1.

1982) (en banc). When lawful authority "commands," the implication is that one has no lawful freedom to refuse. It follows that the appellant's brother did not open the door voluntarily. The next conclusion is inescapable. By commanding appellant's brother to open the door, the police successfully effected a type of involuntary "search" of appellant's room within the meaning of the Fourth Amendment.

### 2. Did the Police Have Probable Cause or Reasonable Suspicion?

■ To pass constitutional muster an involuntary warrantless search must be based on either probable cause or reasonable suspicion without regard to whether exigent circumstances might have excused the obtaining of a warrant. We already indicated by analogizing the facts in this case to a *Terry* stop that the police lacked probable cause to command the opening of the door to room 213. That is, while the police had probable cause to conclude that the robber was in *a* room of the hotel, they lacked probable cause to believe that he was in any *particular* room. However, we hold that the police in this case did have reasonable suspicion that the suspect would be in any room other than one that already had yielded no robbery suspect. The hotel was small, having only two floors, and the number of rooms was limited. The odds on discovering the suspect in the first room upon whose door the police knocked were high enough to amount to founded suspicion. The odds favoring discovery increase as rooms are searched. At some point, perhaps at the last two or three unsearched rooms, probable cause may be said to exist. This is not to be construed as condoning the room by room search of a large hotel or apartment building. The odds favoring discovery of the suspect in the first room on the door of which there is the commanding knock must be more than negligible or minuscule.

We know of no direct authority supporting our position; however, sound reason does provide the required support. To illustrate, assume the police find a small number of persons in a locked room with a murdered man. It would be quite proper to say that each may be reasonably suspected of being a murderer. The suspicion of the police in such a case is reasonable and articulable. *See* Restatement (Second) of Torts § 119 comment j (1965); *see also* 3 W. LaFave, *Search and Seizure* § 9.3(b), at 434–35 & n. 66 (2d ed. 1987) (suggesting that reasonable suspicion but not probable cause exists in this kind of situation).

This reasoning is, moreover, routinely given effect when courts uphold vehicle stops on reasonable suspicion where the police had some information describing the car they were pursuing, but not enough to identify it precisely. *See, e.g., United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir.) (yellow car driven by black female), *cert. denied*, 469 U.S. 931, 105 S.Ct. 326, 83 L.Ed.2d 263 (1984); *Luckett v. State*, 259 Ind. 174, 284 N.E.2d 738, 741–42 (1972) (police "did not have probable cause to stop every green automobile with an 82J license prefix" in a given area, but they did have reasonable suspicion). A good but imperfect description narrows the range of suspected vehicles sufficiently to permit the legal conclusion that reasonable suspicion exists with respect to each car remaining within the suspect range.

The situation here was identical. The police had a very good description of the place where they would find the robber: a room in a small two-story hotel, the first floor of which had already been thoroughly searched before the police arrived at the Winsors' room. The description available to the police at this point was not perfect, but it sufficiently narrowed the range of suspected places to support a holding of reasonable suspicion.

### 3. Was Reasonable Suspicion Sufficient in this Case?

■ Reasonable or founded suspicion can support a warrantless search in exceptional cases. *See, e.g., New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (search by school officials); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (frisk for weapons); *United States v. Alfonso*, 759 F.2d

728 (9th Cir.1985) ("extended" border search). Some kinds of searches—such as those involving entry into a person's home—are so intrusive that they always require probable cause. *See Arizona v. Hicks,* —— U.S. ——, ——, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987).[5] However, for lesser intrusions—searches and seizures alike—the necessity of probable cause depends on their context and the ends they serve. *See T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 741; *United States v. Hensley,* 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985); *Delaware v. Prouse,* 440 U.S. 648, 653–55, 99 S.Ct. 1391, 1395–97, 59 L.Ed.2d 660 (1979). In the balancing test that courts must undertake in these situations, the constitutional touchstone is ultimately the reasonableness of the contested government conduct. *T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 337.

In a case such as this, the permissible extent of intrusion based on reasonable suspicion is extremely limited. Although a hotel by its nature may afford its occupants lesser privacy expectations than does a house, its rooms are places where their occupants have a strong and legitimate expectation of privacy. Against their privacy must be weighed the grave public interest in safely apprehending potentially violent criminals.

Physical danger—to the officers and to the public—has always been the strongest reason justifying police intrusions on less than probable cause. It was this reason that first prompted the Supreme Court to permit such intrusions. *See Terry,* 392 U.S. at 23–24, 88 S.Ct. at 1881. Here, the threat of violence was substantial. The police had cornered their man. After the arrival of various reinforcement units, including a helicopter, the officers realistically had to assume that the criminal knew of their presence. Moreover, he had repeatedly claimed to be armed and had threatened to kill during the course of his robberies. Thus the police reasonably could assume that he was armed. They faced the possibility that the trapped felon might try to take a hostage or that he might prepare himself for a fire fight inside his hotel room.

Delay and indecision by the police would have been an unsafe and inappropriate response. Merely to seal off the area surrounding the hotel would not have eliminated entirely the threat of a hostage-taking. Moreover, to delay until darkness began to fall would have increased the chances of a dash to escape with a nighttime gun battle in the street as a possible outcome. The demands of public safety—and particularly the safety of the hotel's other residents—militate in favor of the course of action employed by the police.

Reinforcing this conclusion is the fact that the actual intrusion here was relatively limited, although not minimal. It consisted of the opening of a door. It was not forcibly opened; rather it was "commanded" to be opened. And although we have held that this "command" rendered the opening of the door "involuntary," here the issue is different. It is whether the intrusiveness of the command to open the door transgresses the limits of the *Terry* doctrine. We hold that it did not.

Finally, the scope of the "search" of appellant's room immediately following the opening of the door was minimal. The officers needed only to see the face of the person who answered the door. They immediately recognized appellant's brother.

---

5. *Hicks* involved a search inside an apartment under the "plain view" doctrine. Although the particular search at issue was relatively unintrusive—turning over a phonograph to see its serial numbers—the Court held that probable cause was necessary. In so holding the Court apparently announced a bright-line rule for searches and seizures inside the home: a "dwelling-place search, no less than a dwelling-place seizure, requires probable cause." 107 S.Ct. at 1154. Regardless of whether a hotel room provides its occupants with an expectation of privacy equivalent in all respects to that which an apartment or house affords, the instant case involves different facts from those in *Hicks.* The officers had not yet entered appellant's room; when they did, probable cause was no longer lacking. The search at issue here consisted solely of the opening of a door. We do not consider this to belong in the category of "dwelling-place" searches to which the rule of *Hicks* applies.

### 4. *Entry Into the Room*

■ At that point probable cause to arrest the brother came into being. When he stepped backward a few paces immediately upon seeing the police, the officers properly entered the room to effect that arrest. Although entry into a home to make an arrest generally requires a warrant, at that moment exigent circumstances existed that justified a warrantless entry. This was true because at that point the officers could reasonably believe that evidence would be lost or persons be put in danger if immediate action was not taken. *See, e.g., United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985). The brother was potentially dangerous, and he had in his possession stolen money. The police, following recognition, were not required under the circumstances to wait for a warrant outside his door while inside evidence of the crime was destroyed or preparations to resist arrest were made.[6]

■ Having lawfully arrested appellant's brother inside the hotel room, a subsequent search by the arresting officers of the room was fully justified. *See Illinois v. Lafayette,* 462 U.S. 640, 644, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983).

### VI.

### THE ARREST OF THE APPELLANT

■ Appellant's last redoubt is his argument that his arrest was constitutionally improper. He argues that the police entry into room 213 for the purpose of arresting his brother constituted an arrest of himself as well; alternatively, he urges that Officer Tuttle's threat to take him "down to the station" if he did not begin giving satisfactory answers amounted to an arrest. In either case, appellant argues, the arrest was without probable cause.

As in other cases of this type, the issue is whether the arrest was too soon. The trial court found that the arrest of the appellant

occurred only after identifying him as the "lookout" in the bank surveillance photograph. At that point, appellant concedes, probable cause to arrest existed. Precisely when an arrest took place has been said to be a question of fact. *Sibron v. New York,* 392 U.S. 40, 67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968). If so, we conclude that the trial court's determination of the time of arrest was not clearly erroneous. If it is a question of law subject to de novo review, we would reach the same result.

### 1. *Entry into the Room*

Winsor, in support of his premature arrest argument, contends that when numerous police officers entered his room with guns drawn, they effectively "arrested" him. Such forceful entry, he argues, completely foreclosed his freedom to leave. This fact would not by itself demonstrate that an arrest, as opposed to temporary detention, had occurred. Again we draw upon the teaching of *Terry v. Ohio, supra.* It holds that the police may briefly but completely detain a person under certain conditions without having actually made an arrest. "Nor will the use of force in making the stop convert [it] into an arrest" if circumstances exist justifying police fears for their safety. *United States v. Greene,* 783 F.2d 1364, 1367–68 (9th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986).

The circumstances existing following the entry by the police required a brief but complete foreclosure of appellant's freedom to leave his hotel room. *See Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (upholding the detention of the occupants of a private dwelling while the police conducted a lawful search of the premises). The police could lawfully detain appellant while effecting the arrest of his brother, a potentially dangerous felon, and the search incident to that arrest.

---

**6.** Our recent holding in *United States v. Alvarez,* 810 F.2d 879 (9th Cir.1987), in which we suppressed evidence because the government had not sought a warrant *by telephone,* does not apply to this case. Before they knocked at the

Winsors' room, the police lacked probable cause and could not have obtained a warrant. After the door was opened, the need for immediate action excused the telephone warrant requirement. *See id.* at 884.

### 2. Threat of Arrest

Appellant next argues that Officer Tuttle's threat to take him "down to the station" if he did not begin giving straight answers constituted an arrest. A more reasonable interpretation is that it was a threat to make forthwith a possibly illegal arrest. No doubt it was improper; however, the officer's threat did not transform appellant's detention into an arrest. So long as an innocent person could reasonably expect, under the circumstances, to be released after brief questioning, no arrest has occurred. *United States v. Pinion,* 800 F.2d 976, 978–79 (9th Cir.1986), *cert. denied,* __ U.S. __, 107 S.Ct. 1580, 94 L.Ed.2d 770 (1987). A reasonable, innocent person would have concluded from Officer Tuttle's statement that he had not yet been arrested and would not be if he answered the officer's questions.

The district court's determination that appellant was actually arrested after Sgt. Moroney identified him was correct. Therefore the arrest did not violate the Fourth Amendment, and Winsor's subsequent statements in custody were admissible against him.

The judgment is AFFIRMED.