**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael JOHNSON, Defendant–**
**Appellant.**

No. 99–30012.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1999

Decided March 10, 2000

Michael Filipovic, Assistant Federal Public Defender, Seattle, Washington, for the defendant-appellant.

Bruce F. Miyake, Assistant United States Attorney, Seattle, Washington, for the plaintiff-appellee.

Before: REAVLEY,[1] FERGUSON, and TROTT, Circuit Judges.

1. The Honorable Thomas M. Reavley, Senior Circuit Judge for the Fifth Circuit, sitting by

designation.

TROTT, Circuit Judge:

Appellant Michael Johnson ("Johnson") appeals from the district court's denial of his motion to suppress evidence found as a result of a warrantless search of his residential property. Johnson filed his motion prior to entering a conditional plea of guilty to a charge of one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). The district court denied Johnson's motion, concluding that the search in question was justified under the exigent circumstances and hot pursuit exceptions to the Fourth Amendment's warrant requirement. Johnson argues on appeal that the search took place within the curtilage of his home, and that the search was not justified by any exception to the Fourth Amendment's warrant requirement. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we AFFIRM.

# I

## Background

At the time of the factual setting of this case, defendant Johnson was a neighbor of Steven Dustin Smith ("Smith") in rural Skagit County, Washington. On February 14, 1998, Deputy Chris Kading ("Kading") of the Skagit County Sheriff's Office drove to Smith's residence to check on Smith's family at the request of Washington State Child Protective Services ("CPS"). CPS based its request on reports that Smith had been abusing his family, which included a newborn baby. Smith lived in his trailer at 3090 South Skagit Highway, just south of the road itself. Smith's mother resided a short distance southwest of Smith's trailer, atop a steep embankment, at 3088 South Skagit Highway. The driveway leading to defendant Johnson's property lay further west at 3034–G South Skagit Highway, approximately 1200 feet west of Smith's driveway. Like Smith's and Smith's mother's property, Johnson's

property lay to the south of South Skagit Highway. The area separating Smith's and Johnson's property is hilly and heavily wooded, as is the area surrounding Johnson's property.

Prior to proceeding to Smith's residence, Kading learned that Smith had five outstanding misdemeanor warrants: one each for driving under the influence, driving with a suspended license, resisting arrest, malicious mischief, and criminal impersonation. As Kading drove down Smith's driveway in his police vehicle at approximately 3:00 p.m., Smith spotted the approaching officer and began to run. Kading quickly exited his vehicle and called for Smith to stop. Smith stopped, but refused Kading's commands to place his hands behind his back. At this time, Smith's wife approached the scene, carrying the couple's newborn baby. Kading testified that Smith appeared agitated, with clenched fists, and stared at his holstered weapon throughout this entire initial encounter. Smith began slowly approaching Kading and then briefly looked off in the direction of the highway. As Smith turned his face back to Kading, Kading sprayed him in the face with pepper spray.

After dropping to the ground, Smith wriggled out of Kading's attempt to constrain him, took off northwest, in the direction of the highway and began running west down the center of South Skagit Highway. Following an approximately 30–second delay spent extricating himself from the pleading clutches of Smith's wife, Kading followed the fleeing Smith in his police vehicle. Kading followed Smith down the highway until, approximately halfway between his own residence and Johnson's driveway, Smith ran south off the highway into the brush and woods and up a steep embankment. Kading lost sight of Smith and, concerned for his safety should he pursue Smith into the woods by himself, called for backup, including a canine unit.

Kading first thought it "logical" that Smith would attempt to double back and run east towards his mother's house. In fact, he relayed this presumption during his first few radio transmissions from the scene. However, citing a "gut feeling ... because [Smith's] thinking I'm thinking he's going to go to his mom's house," Kading continued west down South Skagit Highway and turned left (south) down a long, curvy driveway. Unknown to Kading at the time, this was Johnson's driveway. Some 250 yards up Johnson's driveway, Kading encountered a four or five-foot tall gated cyclone fence, where he awaited backup. The fence was in poor shape, leading Kading to think an animal would be able to get through it.

Kading testified that, parked at Johnson's gate, he was closer to where Smith had run off the highway than he would have been had he begun his search at Smith's trailer or at Smith's mother's house. Kading believed Smith "was just out of sight from where [he] could see through the gate." At some time prior to the arrival of the first backup officer, Kading left this position at the gate to return to Smith's trailer and recover a pepper spray cartridge, which he had dropped during his initial encounter with Smith.

Approximately ten or fifteen minutes after Kading first arrived at the gate, Deputy John Rose came on the scene and proceeded directly to Smith's mother's residence to set up an eastern perimeter in conjunction with Kading's western perimeter. Another ten to fifteen minutes later, Deputy Kevin Sigman joined Kading at Johnson's gate. Kading and Sigman then decided that, due to their remote location, it would take too long for the requested canine unit to arrive. Feeling much better about the issue of officer safety now that they did not have to perform a single-officer search of the densely covered area, Kading and Sigman decided to enter the gated portion of Johnson's property to continue the search for Smith. Kading and Sigman planned to move gradually eastward to try and pin Smith between themselves and Rose.

Kading and Sigman manipulated the hasp on Johnson's locked gate to enable them to drive further up the driveway. Eventually, they came upon Johnson's house and an enclosed dog kennel. Ninety feet separated the two structures. Kading and Sigman knocked on the door of the house, found no one home, checked a covered area in the back of the house, and walked around the outside of the dog kennel to perform a cursory check. They also looked for Smith inside two old vehicles parked near the kennel and under a blue tarp resting near the cars. Having seen no sign of Smith, the officers proceeded north, down a hill behind the kennel. As they proceeded, they spotted an old "mushroom shed," [2] approximately 120–150 feet from Johnson's house. A shadowy, darkened doorway led Kading and Sigman to believe that the shed might be a hiding spot for Smith.

Kading and Sigman approached within one to two feet of the mushroom shed and observed a new padlock hanging from the door. While standing in the doorway, Kading smelled what he recognized as marijuana through a vent built into the shed. After testing the padlock to confirm that it and the door were locked, Kading and Sigman left Johnson's property and drove to Smith's mother's residence. They never found Smith.

Subsequently, a search warrant was obtained based upon Kading's and Sigman's observations while on Johnson's property.[3] The search warrant was executed on February 19, 1998, and 771 marijuana plants were recovered from Johnson's house, shed, and kennel.

Johnson pled guilty to one count of manufacturing marijuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), but preserved his ability to appeal the district court's denial of his motion to suppress the evidence found as a result of the executed search warrant.

## II

### Discussion

On appeal, Johnson argues that Kading and Sigman's search violated the warrant requirement of the Fourth Amendment to the United States Constitution;[4] thus, he claims, the evidence uncovered as a result of the subsequently acquired and executed search warrant should be suppressed as fruit of the poisonous tree. *See, e.g., Wong Sun v. United States,* 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). First, Johnson argues that the search took place within the curtilage of his home, and thus was subject to the Fourth Amendment's warrant requirement. Second, Johnson argues that the search cannot be supported by any exception to the Fourth Amendment's warrant requirement, such as the "hot pursuit" or "exigent circumstances" exceptions. Because we conclude that the search was justified by hot pursuit and exigent circumstances, we assume but do not decide that the search occurred within the curtilage of Johnson's home,

---

**2.** Johnson refers to this shed as a "mushroom shed" due to the previous owners' efforts at growing mushrooms inside.

**3.** Testimony at the suppression hearing suggests that prior to, and at the time of the search, the Skagit County Inter–Local Drug Enforcement Unit had Johnson's property under surveillance as the location of a suspected marijuana-grow operation. However, this surveillance was completely independent from the search for Smith, and there is no evidence that any officer involved in the search had any knowledge of the Drug Enforcement Unit's efforts. Though members of

the search team knew members of the Drug Enforcement Unit's team, neither Kading nor Sigman learned of the surveillance until after they had completed their search for Smith.

**4.** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

and thus the warrant requirement of the Fourth Amendment was implicated.

Johnson advances three reasons for his assertion that no exception to the warrant requirement made the officers' initial entrance onto the property to search for Smith a constitutionally legitimate entrance and search. First, he argues that the officers had no objective knowledge that Smith was located on Johnson's property. Second, he argues that the officers were not engaged in "hot pursuit" of Smith because their pursuit was neither immediate nor continuous. Finally, he argues that even if the officers were engaged in hot pursuit of Smith, the hot pursuit exception may not be applied where the pursuit is based on outstanding misdemeanor warrants.

### A. *Standard of Review*

■ The validity of a warrantless search is reviewed de novo. *United States v. Van Poyck,* 77 F.3d 285, 290 (9th Cir. 1996). Probable cause determinations are reviewed de novo. *United States v. Suarez,* 902 F.2d 1466, 1467 (9th Cir.1990). Exigent circumstances present a mixed question of law and fact reviewed de novo. *United States v. VonWillie,* 59 F.3d 922, 925 (9th Cir.1995). However, findings of fact underlying the district court's determination of exigent circumstances are reviewed for clear error. *Id.*

### B. *Warrantless Searches—The Government's Burden*

■ Because we assume that the search for Smith occurred within the curtilage of Johnson's house, and that Johnson therefore had a reasonable expectation of privacy in the place searched, the warrant requirement of the Fourth Amendment to the United States Constitution is implicated. In order to demonstrate the legality of this warrantless search, the government has a twofold duty. *United States v. Lai,* 944 F.2d 1434, 1441 (9th Cir.1991). First, it must show probable cause to enter the area searched. *Id.* Applied to the facts of

this case, the government must show that the officers had probable cause to believe Smith was on Johnson's property. *See United States v. Scott,* 520 F.2d 697, 700 (9th Cir.1975). Second, the government must show that exigent circumstances justified the warrantless search. *Lai,* 944 F.2d at 1441.

### 1. *Probable Cause*

■ Probable cause requires a reasonable belief, evaluated in light of the officer's experience and the practical considerations of everyday life, that the suspect has committed a crime and is to be found in the place to be searched. *United States v. Salvador,* 740 F.2d 752, 757 (9th Cir. 1984); *see also United States v. Lindsey,* 877 F.2d 777, 780 (9th Cir.1989) (requiring a "practical common-sense decision," under the "totality of the circumstances," that there was a "fair probability" contraband or evidence of a crime would be found inside the place to be searched) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *United States v. Dawkins,* 17 F.3d 399, 404 (D.C.Cir.1994) (applying a totality of the circumstances approach to probable cause, emphasizing "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act") (quoting *Gates,* 462 U.S. at 231, 103 S.Ct. 2317). There is no dispute in this case as to whether Smith committed a crime. Officer Kading knew Smith had five outstanding misdemeanor warrants and, more importantly, that he had just resisted arrest and fled the scene.

■ We must consider whether Kading had probable cause to believe Smith would be found in the place to be searched— Johnson's property. Kading followed as Smith ran down the center of South Skagit Highway until Smith turned south off the highway and into the brush, approximately halfway between his trailer and the driveway to Johnson's residence. Kading initially thought it logical that Smith would return to his mother's house. Yet, Kad-

ing's "gut feeling" told him that Smith would attempt to avoid such a logical destination. On this belief, Kading drove further west, concluding that Smith would continue to flee in that direction, away from both his trailer and his mother's house.

Nothing suggests that Kading's conclusion was anything but reasonable. In this situation, given the direction of Smith's flight from the highway, Kading might reasonably have predicted continued flight in the direction of Smith's mother's house (southeast), Johnson's property (southwest), or straight ahead (due south). Under the totality of the circumstances, Kading made a practical common-sense decision as to which direction Smith was likely to run. Furthermore, that Smith would be attracted to the shelter of a structure—such as Johnson's house, kennel, or shed—is eminently reasonable. While no evidence exists of any relationship between Smith and Johnson, this has no bearing on where Smith might seek refuge during flight from the law.

■ The Fourth Amendment's probable cause requirement cannot limit an officer's search to only the most logical of hiding-places or destinations. *Cf. Scott,* 520 F.2d at 702 (stating that the doctrine of "hot pursuit," as established in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), "does no more than allow a fairly broad search while seeking a suspect in order to arrest him") (Ferguson, J., dissenting). Were that the case, police officers' efforts in a hot pursuit would be persistently frustrated by both intelligent criminals and criminals completely incapable of logic: the former because of their ability to predict and thus avoid the most logical destinations and the latter because they would be clueless as to where logic dictates they go.

The approximate thirty minute delay between the time Kading lost sight of Smith and the time Kading and Sigman began their search of Johnson's property does not weaken a finding of probable cause. It is well within reason for an officer to conclude that a fleeing criminal may seek a hiding place nearby in an attempt to wait any search out. This is especially true in the rural area at issue in this case, which was dense with brush and trees. Smith could find many temporary hiding places in the area from which to monitor the officers' search efforts. The conclusion that Smith might be hiding nearby his original exit point from the South Skagit Highway, even after a thirty minute period, was a reasonable one.

Johnson's offered authority to the contrary of this conclusion is distinguishable and thus unpersuasive. As support for the argument that the pursuing officers had no objective basis for their belief that Smith was hiding somewhere on his property, Johnson cites *United States v. Winsor,* 816 F.2d 1394 (9th Cir.1987), *vacated on other grounds,* 846 F.2d 1569 (9th Cir.1988) (en banc), *Dawkins,* 17 F.3d 399, and *United States v. Lindsay,* 506 F.2d 166 (D.C.Cir. 1974). Though these cases involve warrantless entries, the similarity to Johnson's case ends there.

*Winsor* involved a police search of each room in a hotel where the police had probable cause to believe the fleeing suspect was somewhere in the hotel. 816 F.2d at 1396–97. Noting that each room in the hotel enjoyed its own protection against unreasonable searches and seizures, the court determined that, while the police may have had probable cause to believe the suspect was in a room in the hotel, they lacked probable cause to believe he was in any particular room. *Id.* at 1397. Johnson analogizes his case to *Winsor* by arguing that, like the hotel rooms in that case, here Kading had no "particularized suspicion" that Smith was hiding on his property as opposed to any other property. *See Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (requiring, in the context of a reasonable search for weapons on a suspect reasonably believed to be armed and dangerous, that "due weight be given, not to [the officer's] in-

choate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience"). Therefore, Johnson argues that Kading and Sigman lacked probable cause to search his property.

Johnson's reliance on *Winsor* is misguided for three reasons. First, the factual distinctions between the two cases cannot be harmonized. Nothing in the *Winsor* factual scenario gave the police any reason to believe the suspect was hiding in any individual hotel room. Here, after rationally concluding that Smith would not run to hide at his mother's house, Kading concluded that it was at least reasonably likely that Smith would run to hide on Johnson's property, considering where Smith left the highway. This conclusion as to the probable destination or hiding place is easier sustained in this rural area than in a motel, especially where the pursuing officer can make reasonable inferences to eliminate a significant proportion of potential destinations.

■ Second, our precedent requires no more than what Kading did. *See Lindsey,* 877 F.2d at 780; *Salvador,* 740 F.2d at 757. Under the "totality of the circumstances," Kading made this "practical common-sense decision" that a "fair probability" existed that Smith would be found hiding on Johnson's property. We conclude that Kading's "gut feeling" was a "reasonable belief." [5]

Finally, even if the language from *Terry* guided our analysis here, it is clear that Kading's "hunch" was in fact a "specific reasonable inference." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. His belief was not baseless. His thought process was entirely rational and reasonable. Kading attempted to put himself in Smith's shoes to determine where Smith would most likely

attempt to hide. This was good police work, not mere guesswork or a blind attempt to find a needle in a haystack.

Johnson's reliance on *Dawkins* is similarly misplaced. In *Dawkins,* the police received a call from a woman informing them that defendant Dawkins, an escapee from a juvenile detention facility, had drugs and guns in his apartment. 17 F.3d at 401. The court concluded the police officers did not have probable cause to believe Dawkins was inside his apartment. *Id.* at 407. The court based this conclusion on the fact that the police had just questioned a man who fit the informant's description of Dawkins at another apartment where the informant indicated Dawkins could be found. *Id.* at 401–02. Furthermore, after emptying his pockets, the man fitting Dawkins's description gave the officers a key that ultimately fit the lock on Dawkins's own apartment door. *Id.* The court held that the government had not met its burden of demonstrating the requisite "urgent need" to search Dawkins's apartment without a warrant.

Unlike the police in *Dawkins,* Kading suffered no such failure to see the obvious in his attempt to locate Smith. No clues should have led him to believe, conclusively, that Smith was somewhere other than Johnson's property. Therefore, Johnson's reliance on *Dawkins* is inappropriate.

Finally, Johnson may not rely on *Lindsay.* In *Lindsay,* the government attempted to justify the warrantless entry of a hotel room under theories of "urgent need," *Dorman v. United States,* 435 F.2d 385 (1970) (en banc), and hot pursuit of a fleeing bank robber. *Lindsay,* 506 F.2d at 171–73. The court noted that one factor under the *Dorman* "urgent need" exception to the warrant requirement was "a strong reason to believe that the suspect is in the dwelling." *Id.* at 171. The court

---

**5.** Of course, the fact that the officers never found Smith cannot play a role in analyzing whether Kading's belief was reasonable at the time formed. *See Murdock v. Stout,* 54 F.3d 1437, 1444 (9th Cir.1995) ("The fact that the officers' suspicions were wrong does not alter our view that the circumstances known to them outside of the house justified all of their actions.").

also identified "speed and a continuous knowledge of the alleged perpetrator's whereabouts" as the elements underpinning the hot pursuit exception. *Id.* at 173.

The police officers in *Lindsay* already had the registered occupant of the motel room in custody and had last seen the accomplice running away from the motel at least a half an hour earlier. *Id.* Therefore, under both an "urgent need" and a hot pursuit analysis, the court concluded that the government could not meet its burden to show the requisite level of suspicion that the accomplice was in the motel room at the time of the search. *Id.* at 171, 173.

While the thirty-minute gap in last-known whereabouts in *Lindsay* is similar to that of Johnson's case, the crucial difference is that the accomplice was seen running away from the motel, not towards it. *See id.* at 173; *see also id.* at 171 (noting that it would be especially unlikely for the accomplice to return if he believed his cohort—the registered occupant of the room—had been apprehended). Thus, if Smith had run north off of South Skagit Highway, it is likely that Kading would not have had the requisite reasonable belief to establish probable cause to search Johnson's property to the south of the highway.

Therefore, because we conclude Kading reasonably believed—based on the totality of circumstances and a practical common-sense decision—that Smith would be found on Johnson's premises, the warrantless search of Johnson's property did not lack probable cause.

### 2. *Exigent Circumstances and Hot Pursuit*

Johnson next argues that the initial warrantless search of his property does not fit within any exception to the Fourth Amendment's warrant requirement, thus making it an illegal search. The district court denied Johnson's suppression motion, citing both "hot pursuit" and exigent circumstances as the applicable exceptions to the Fourth Amendment's warrant requirement. The relevant exception to the

Fourth Amendment in this case first developed in *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). In *Warden,* the Supreme Court upheld a warrantless search where "the exigencies of the situation made that course imperative." *Id.* at 298, 87 S.Ct. 1642 (quoting *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948)). The Court held that "[t]he Fourth Amendment does not require police to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Id.* at 298–99; *see also United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) ("Hot pursuit means some sort of a chase, but [not necessarily] an extended hue and cry in and about the public streets.") (internal quotations and punctuation omitted). We have treated this language as creating the doctrine of "hot pursuit." *See, e.g., Scott,* 520 F.2d at 700.

■ This court has defined exigent circumstances to mean "those circumstances that would cause a reasonable person to believe that entry ... was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney,* 728 F.2d 1195, 1199 (9th Cir.1984) (en banc); *see also Lindsey,* 877 F.2d at 780–81. If there is any distinction between "hot pursuit" and the exigent circumstance involving "the escape of the suspect," it is immaterial under the circumstances of this case.

■ Having concluded that there is no material difference between the doctrines of "hot pursuit" and exigent circumstances involving the escape of a suspect for the purposes of this case, the government's burden is clear. Though there need not be an "extended hue and cry in and about the public streets," *Santana,* 427 U.S. at 43, 96 S.Ct. 2406 to fit within this exception to the warrant requirement,

the government must show that the officers' pursuit of Smith was "immediate or continuous." *See Welsh v. Wisconsin,* 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Salvador,* 740 F.2d at 758 n. 5. Additionally, as a finding of exigent circumstances necessarily presupposes inadequate time to acquire a warrant, the government's burden is not satisfied unless it can demonstrate that a warrant could not have been obtained in time even by telephone under the procedure authorized by Federal Rule of Criminal Procedure 41(c)(2). *United States v. Manfredi,* 722 F.2d 519, 522 (9th Cir.1983).

 Johnson argues Kading's and Sigman's search cannot be justified by a "hot pursuit exigency" exception to the Fourth Amendment's warrant requirement. Therefore, he argues, the officers' failure to acquire a warrant prior to the initial search of his property requires the suppression of any evidence found during that search and, as fruit of the poisonous tree, any evidence found during the February 18 search exercised pursuant to a warrant. As noted above, his argument focuses on two separate points: first, that the search for Smith was neither immediate nor continuous; and second, that the search may not be supported under a rationale of exigent circumstances due to the minor nature of the underlying misdemeanor warrants for which the officers

pursued Smith. We will discuss these issues separately.[6]

### a. *"Immediate or Continuous"*

 The hot pursuit exigent circumstance exception invoked by the government to justify the officers' warrantless search of Johnson's property requires that pursuit be either immediate or continuous from the scene of the crime. *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091; *Salvador,* 740 F.2d at 758 n. 5. Any exigency is to be viewed from the totality of the circumstances known to the officers at the time of the warrantless intrusion. *Lindsey,* 877 F.2d at 781. Furthermore, the government must produce "specific and articulable facts to justify the finding of exigent circumstances." *United States v. Alvarez,* 810 F.2d 879, 881 (9th Cir.1987) (quoting *United States v. Driver,* 776 F.2d 807, 810 (9th Cir.1985)). *Warden* taught that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." 387 U.S. at 298–99, 87 S.Ct. 1642. Conversely, here we are forced to decide whether, on the facts of this case, the Fourth Amendment hot pursuit exigent circumstance exception required Officer Kading to immediately leave his vehicle and trudge off into the dense brush and woods in search of Smith, exposing himself to a possible ambush. We decide that he

---

**6.** Though he cites *Lai,* 944 F.2d at 1442, in his opening brief for the *Manfredi* rule regarding telephonic warrants, Johnson did not pursue or even attempt to argue this issue in either his briefs or at oral argument. Thus, we deem this issue waived. *See United States v. Vought,* 69 F.3d 1498, 1501 (9th Cir.1995). Even had Johnson pursued the officers' apparent failure to make a good faith attempt at acquiring a telephonic warrant or the lack of evidence as to the officers' inability to acquire a warrant, his argument would fail.

While the failure to make a good faith attempt to acquire a telephonic warrant normally requires suppression, *see United States v. Tarazon,* 989 F.2d 1045, 1050 (9th Cir. 1993), this court has excepted such a requirement where it is clear time does not allow the acquisition of even a telephonic warrant.

*Compare id.* (noting that 30 minutes is insufficient time to obtain a telephonic warrant) *and Manfredi,* 722 F.2d at 523 ("A telephonic warrant may not be obtained simply by calling a magistrate. Among other things, a duplicate original warrant must be prepared in writing and read to the magistrate verbatim.") (citations and internal quotations omitted) *with United States v. Alvarez,* 810 F.2d 879, 882–83 (9th Cir.1987) (90 minutes is enough time to seek warrant, especially where agents were able to discuss the case fully with personnel of the U.S. Attorney's office during that time). The 30 minute period between last sighting of Smith and the entry onto Johnson's premises similarly excuses the officers' failure to attempt to acquire a telephonic warrant in this case.

was not required to do so in order to fit within this exception to the warrant requirement.

■ A substantial delay between the last known sighting of a fleeing criminal and the beginning of a search for that criminal will clearly negate any applicability of the hot pursuit exigent circumstance exception. *See Alvarez,* 810 F.2d at 881–82 (holding agents' actions fundamentally inconsistent with any true exigency where between ninety minutes and two hours elapsed from the time they learned where suspect was located to when they actually arrested him); *Salvador,* 740 F.2d at 755–56, 758 n. 5 (no hot pursuit where bank robbery occurred in early afternoon and police set up surveillance of house, which led to search just prior to 8:00 that evening). Furthermore, where it is clear the police can set up a guard of the perimeter so as to prevent the suspect's escape while waiting for a warrant, a claim of exigency is severely undermined. *See United States v. Duran–Orozco,* 192 F.3d 1277 (9th Cir.1999) (where police could guard perimeter of house during two-and-a-half hour wait for warrant, warrantless look into back window not supported by exigency rationale). Here, due to the nature of the terrain, the officers would not have been able to establish a perimeter sufficient to ensure Smith's capture or inability to escape.

Kading's pursuit of Smith was both immediate and continuous, at least up until the point when Smith ran off the highway into the woods. Johnson argues that the thirty-minute delay between the last-known sighting and the first entrance onto his property sufficiently cooled down the pursuit to take it outside the realm of any Fourth Amendment exceptions. To this end he relies on *O'Brien v. City of Grand Rapids,* 23 F.3d 990 (6th Cir.1994), and *United States v. Morgan,* 743 F.2d 1158 (6th Cir.1984). Both cases, however, are distinguishable.

In *O'Brien,* the police surrounded a suspect's home when the suspect brandished a weapon at an officer, who was on the scene to aid in the execution of a writ of seizure on the suspect's pick-up truck. 23 F.3d at 993. The officer called for backup, and the police engaged in an approximately nine-hour standoff with the suspect. *Id.* at 993–94. After approximately four-and-a-half hours, the police performed the first of four warrantless "probes" of the house by peering into a window using mirrors. *Id.* at 994. The Sixth Circuit decided that the probes were not justified by any exigent circumstance or by hot pursuit, as the initial officer on the scene chose not to pursue the suspect after the first confrontation, but instead "called for backup to surround the house and secure the area, thereby slowing down and controlling the action." *Id.* at 997.

The case we must decide has two important factors which distinguish it from *O'Brien.* First, there was no standoff. Second, the area was by no means "secure" and the action was clearly not "controlled." *Cf. United States v. Curzi,* 867 F.2d 36, 42 (1st Cir.1989) (rejecting exigency rationale where officers "waited for almost two hours before bringing the operation to its planned climax.... Time was ample; manpower abounded; the premises were surrounded and secured; the neighbors had been led to safety; the drama was being played out during daylight hours and in an urban setting. All in all the situation was in good control."). Both of these factors make Kading's delay for backup entirely consistent with a hot pursuit rationale tempered with concerns for officer safety. *Cf. Lindsey,* 877 F.2d at 781–82 (rejecting argument that one hour delay for reinforcements precluded finding of exigency where officers expected backups to arrive quickly and did not realize there would be a delay).

■ The exigency had not dissipated merely because Kading understandably delayed his pursuit due to safety concerns. Of course, a safety concern must be reasonable and cannot be used as a pretext

for a more controlled and organized—yet still warrantless—search. We merely decide under these facts that in a heavily wooded, rural area, with a single officer in pursuit of a fleeing suspect, the officer's decision to delay a search for a reasonable amount of time to wait for backup is not inconsistent with the hot pursuit exigent circumstance exception to the Fourth Amendment's warrant requirement.

*Morgan,* Johnson's other relied-upon case for his argument that the officers' pursuit was neither immediate nor continuous, is similarly distinguishable. In that case, officers decided—prior to arriving at a suspect's home—to meet at a coffee shop to "assess the situation," discuss the logistics of approaching the suspect's home, position everyone, and give out assignments. *Morgan,* 743 F.2d at 1160. Noting that the "hot pursuit exception is reserved for situations where speed is essential," the court decided these facts directly contradicted the notion that the officers were in hot pursuit of the suspect since their first encounter with him earlier that day. *Id.* at 1162. Here, aside from briefly conferring to decide that it would take too long for the canine unit to arrive and that, with three officers now on the scene, safety concerns had diminished, Kading and Sigman did not stop to plan or organize their efforts to the extent the officers did so in *Morgan.* Thus, the government's claim of a hot pursuit exigent circumstance does not fail on these grounds.

Other courts have similarly concluded that the hot pursuit trail does not necessarily cool down because an officer briefly delays a search in the course of taking prudent safety precautions. *See Griffin v. City of Clanton,* 932 F.Supp. 1359, 1367 (M.D.Ala.1996) (concluding that hot pursuit still applicable where officer waited for backup, which arrived before suspect had gained admittance to aunt's house though he was banging on back door and yelling); *St. Laurent v. Town of Sturbridge,* No. 89–30005–F, 1990 WL 92470, at **7–8 (D.Mass. June 18, 1990) (concluding that hot pursuit exigent circumstance applicable where "[i]t would have been as imprudent for [the officer] to have marched directly into the [suspect's] house as it would be incorrect to penalize him for waiting for assistance" when need for backup compelling and backup arrives within thirty minutes). Under the circumstances of this case, Kading's decision to delay his search until backup arrived broke neither the immediacy nor the continuity of his search for Smith. Therefore, Johnson's argument on this point fails.[7]

### b. *The Underlying Warrants*

■ Johnson's final argument focuses on the nature of Smith's outstanding warrants. Relying on *Welsh,* he argues that the five warrants underlying Kading's pursuit of Smith cannot support a finding of hot pursuit exigency. The Supreme Court hesitated to find exigent circumstances in *Welsh* "especially when warrantless arrests in the home are at issue ... when the underlying offense for which there is probable cause to arrest is relatively minor." 466 U.S. at 750, 104 S.Ct. 2091. Thus, the gravity of the underlying offense is an "important factor to be considered when determining whether any exigency exists." *Id.* at 753, 104 S.Ct. 2091; *see also Salvador,* 740 F.2d at 759. Notwithstanding our hesitancy to engage in the type of measuring necessary to gauge the relative "gravity" of offenses for purposes of exigency determinations, Johnson's reliance on *Welsh* is misplaced for several reasons. *See Welsh,* 466 U.S. at 760, 104 S.Ct. 2091 ("A test under which the existence of exigent circumstances turns on the perceived gravity of the crime would significantly hamper law enforcement and

---

**7.** We also reject Johnson's contention that Kading's brief return to Smith's trailer to retrieve the dropped pepper spray canister broke the continuity or immediacy of the search. Such a ruling would in essence require an officer to refrain from engaging in any other search or operation-related activity while waiting for backup.

burden courts with pointless litigation concerning the nature and gradation of various crimes.") (White, J., dissenting).

First, and most determinative of our outcome on this issue, Kading's pursuit was not based on the underlying five warrants alone, but also on a current and continuous violation of the law. Smith had just actively resisted Kading's attempts to arrest him. The officers in *Welsh* arrested the defendant in that case while he lay drunk and naked in his bed. *Id.* at 743, 104 S.Ct. 2091. Had the defendant there not complied with the arresting officers, but instead leapt out his window and run down the street, the Court would have been faced with a very different case—and the neighborhood with a very different spectacle.

This first point is even more clearly demonstrated in view of one attempted rationalization of the *Welsh* court's emphasis on the gravity of the offense. There is some suggestion that the "gravity of the offense" limitation makes sense because "the seriousness of the offense with which a suspect may be charged also bears on the likelihood that he will flee and escape apprehension if not arrested immediately." *Id.* at 759, 104 S.Ct. 2091 (White, J., dissenting); *see also United States v. George*, 883 F.2d 1407, 1413 n. 3 ("One suspected of committing a minor offense would not likely resort to desperate measures to avoid arrest and prosecution."). Assuming the offenses underlying Smith's warrants could be considered only shallowly grave, not only is there a likelihood that he would flee anyway, but, in fact, he did flee. Whatever constraint *Welsh* may place on an officer's attempt to pursue a fleeing suspect became insignificant when Smith began to actively resist arrest.

Second, *Welsh* involved a warrantless intrusion into the suspect's home to arrest him for driving a motor vehicle while under the influence. 466 U.S. at 743, 104 S.Ct. 2091. In support of its holding, the Court reiterated the long-established supposition that "physical entry of the home is

the chief evil against which the wording of the Fourth Amendment is directed." *Id.* at 748, 104 S.Ct. 2091 (quoting *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Thus, while the gravity of the underlying offense is certainly a factor, it is not the only variable influencing *Welsh* and its progeny. Here, Kading and Sigman did not enter Johnson's house in the process of searching for Smith.

Therefore, we conclude that Johnson's argument based on the severity of the warrants underlying the search for Smith is unpersuasive because Smith actively resisted Kading's attempts to arrest him and because the search never included the inside of anyone's home.

## III

### Conclusion

Though the initial search of Johnson's property occurred without benefit of a search warrant, the search fits within the hot pursuit exigency exception to the Fourth Amendment. Officers Kading and Sigman had probable cause to believe Smith might be found hiding somewhere on Johnson's property. Their pursuit of Smith was both immediate and continuous, despite Kading's safety precaution of waiting thirty minutes for backup. The nature of the warrants underlying the search for Smith does not deprive the search of its legality under the hot pursuit exigency exception to the Fourth Amendment's warrant requirement. For these reasons, we conclude that the district court correctly denied Johnson's motion to suppress. Johnson's conviction stands.

AFFIRMED.

FERGUSON, Circuit Judge, Dissenting:

The majority opinion eviscerates long standing and important principles underlying the Fourth Amendment. Under the majority's holding, a police officer's "gut feeling" constitutes probable cause, and an

officer is in "hot pursuit" even when he has not seen his suspect for over a half hour. Because these holdings contradict well-established Supreme Court and Ninth Circuit precedent, I dissent.

## I. *Warrantless Searches*

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The presumption of unreasonableness can be overcome when the police are confronted with exigent circumstances. *See Wisconsin v. Welsh,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In these situations, the exigent circumstances relieve the police of the obligation of obtaining a warrant. *Murdock v. Stout,* 54 F.3d 1437, 1441 (9th Cir.1995). The exigent circumstances do not, however, relieve the police of the need to have probable cause for the search. *Id.* As a result, when the government relies on the exigent circumstances exception, it still must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion. *United States v. Lai,* 944 F.2d 1434, 1441 (9th Cir.1991). Based on the record before us, the government failed to satisfy either requirement.

### A. Probable Cause

In this case, the majority finds the officers had probable cause to search for Smith within the curtilage of Johnson's property. In support, the majority relies *exclusively* on Officer Kading's "gut feeling" that Smith was hiding on Johnson's property. Notably, the majority does not provide a single objective fact to support its determination that Officer Kading's "hunch" established probable cause. Because "hunches" are insufficient to establish reasonable suspicion, let alone proba-

ble cause, I strongly disagree with the majority's analysis and conclusion. *See Illinois v. Wardlow,* —— U.S. ——, 120 S.Ct. 673, 675–76, 145 L.Ed.2d 570 (2000) (stating that reasonable suspicion, which is "less demanding than probable cause," requires an officer to articulate more than an "unparticularized suspicion or 'hunch' "); *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (same); *United States v. Kerr,* 817 F.2d 1384, 1387 (9th Cir.1987) (emphasizing that even for a *Terry* stop, "hunches alone will not withstand constitutional scrutiny").

Probable cause is hardly a new concept. For over 75 years, the Supreme Court has stated that probable cause exists when the "facts and circumstances" before the officer are sufficient to warrant a person of reasonable caution to believe that the items sought will be found in the place to be searched. *See Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). The Supreme Court has emphasized that probable cause "demands" factual "specificity" and "must be judged according to an objective standard." *Terry,* 392 U.S. at 21–22 n. 18, 88 S.Ct. 1868. "Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more than *inarticulate hunches,* a result this Court has consistently refused to sanction." *Id.* at 22, 88 S.Ct. 1868. (emphasis added).

Despite these bedrock principles, the majority finds probable cause in this case even though Officer Kading did not provide a single objective fact to support his "gut feeling." At the suppression hearing, Officer Kading testified that he initially thought that it was "logical" that Smith would turn right (southeast) in the woods and head directly toward his parent's house. He was so confident of this prediction that when he radioed for backup, he told the responding officers to proceed to Smith's parent's house. Soon afterward, however, he had second thoughts. He

stated that he tried to get inside of Smith's head and out smart him. He speculated that if Smith thought the officers would go to his parent's house, Smith would probably do the opposite and run toward Johnson's house (southwest). When asked how he came to this conclusion, Officer Kading admitted that it was just a "gut feeling."

Despite the lack of objective evidence to support Officer Kading's "gut feeling," the majority nevertheless finds probable cause based on its own "subjective" belief that Officer Kading's hunch was "rational" and "reasonable." In support of its conclusion, the majority relies on a series of sweeping generalizations that are totally unsupported by the record. For example, the majority sets up a scenario in which once Smith ran into the woods, he only had three options: he could run toward his parent's house (southeast); he could run toward Johnson's property (southwest); or he could run straight (due south). Based on this unrealistic scenario, the majority decides that "Kading made a practical common-sense decision" that Smith ran toward Johnson's house. There are two problems with this conclusory reasoning.

First, the majority does not provide any facts to support Officer Kading's "practical common sense decision." For example, the majority does not claim that Officer Kading saw footprints leading toward Johnson's property, heard sounds coming from Johnson's property, or observed broken branches on the trees leading toward Johnson's property. The only thing that Officer Kading knew was that a half hour earlier, Smith had run into the woods halfway between Johnson's driveway and Smith's driveway. That is the extent of the objective facts.

Second, the majority does not explain why Smith only had three options. After all, this was a sparsely populated rural area. The terrain was hilly and covered with thick brush and trees. Once Smith got into the woods, his options were unlimited. In addition to the three options the majority listed, he could have run toward his own property (east); he could have run past Johnson's property (southwest); he could have stayed in the woods by the highway and used it as a lookout post; or he could have watched Kading drive down Johnson's driveway and then run across the street into the woods on the other side of the highway (north). This is by no means an exhaustive list. It is just a sample of the additional options Smith had once Officer Kading lost sight of him. Given these choices, the majority has no basis for stating that Officer Kading's decision to search the curtilage of Johnson's property was "common-sense."

Possibly recognizing the weakness of its argument, the majority tries to strengthen it by stating that it is "eminently reasonable" that Smith "would be attracted to the shelter of a structure—such as Johnson's house, kennel, or shed." This conclusory statement suffers from the same problems as the last. There are simply no facts to support Officer Kading's hunch that he sought shelter on Johnson's property. Based on the information in the record, it is just as likely that Smith would have sought shelter on his parent's property, his own property, some other neighbor's property, or out in the woods. As a result, the only thing supporting the majority's statement is Officer Kading's "gut feeling." As the majority well knows, however, hunches are insufficient to establish probable cause. *Wardlow*, 120 S.Ct. at 675–76; *Terry*, 392 U.S. at 27, 88 S.Ct. 1868; *Kerr*, 817 F.2d at 1387.

The majority's efforts to distinguish the cases cited by the Appellant are equally unpersuasive. The first case the majority examines is *United States v. Winsor*, 816 F.2d 1394 (1987), *vacated on other grounds*, 846 F.2d 1569 (9th Cir.1988) (en banc). In *Winsor*, the police followed a bank robber to a "small two-story 'residential hotel'" and watched him "disappear"

into the building. *Id.* at 1395–96. The police went room to room and demanded that the occupants open their doors. *Id.* at 1396. The police eventually found the person they were looking for. *Id.*

On appeal, we rejected the government's argument that the "hot pursuit" exception justified the warrantless search. We stated that inside a hotel, each room enjoys its own zone of protection from unreasonable searches and seizures. *Id.* at 1397. Based on this principle, we held that although the police had probable cause to enter the hotel, they did not have probable cause to search any particular room. *Id.*

The Appellant in this case argues persuasively that, like the individual hotel rooms in *Windsor,* all of the homes in the area where the police last saw Smith enjoyed a zone of privacy that could not be invaded without probable cause. The majority, however, rejects this analogy for the following irrational reasons. First, the majority claims that unlike *Winsor* where the suspects could have been hiding in any one of the rooms, Smith only had a limited number of hiding spots in the woods. Second, the majority states that once the officers "rationally" eliminate Smith's parent's house as one of his potential hiding places, it was logical for them to search Johnson's property. Third, the majority claims that when Officer Kading followed his "gut feeling" it was "good police work." Finally, the majority makes the bold statement that in this case, "Kading's 'gut feeling' was a 'reasonable belief.'" These far reaching statements, however, are totally unsupported by the facts of this case and our Constitution.

First, I do not agree with the majority's assertion that there are fewer hiding places in a wooded, rural area, than in a hotel. In fact, the opposite is likely true. In *Winsor,* 816 F.2d at 1395–96, the police at least knew that the suspect was somewhere in the hotel; they just did not know in which room he was hiding. By contrast, in this case, the area where Smith was last seen is sparsely populated and covered with thick brush and trees. Johnson's property alone contains over 12 acres and the adjoining property where Smith was last seen is at least as big. In this environment, the hiding places are potentially endless. This is especially true given that Smith was probably very familiar with the terrain in this area since it was essentially located in his backyard. Based on these facts, the majority's attempt to distinguish the factual setting in *Winsor* from this case is unpersuasive.

Second, the record does not support the majority's assertion that the officers had "rationally" eliminated Smith's parent's house as a potential hiding spot. Even when Officer Kading's "gut feeling" redirected him toward Johnson's property, he still left an officer posted at Smith's parent's house just in case Smith decided to return there. Despite the majority's claim to the contrary, it was just as likely that Smith was hiding at his parent's house as anyplace else.

Third, the majority's statement that Officer Kading's hunch was "good police work" is unsupported by the record and irrelevant to the probable cause determination. It is unsupported by the record because the officers never found Smith on Johnson's property. It is irrelevant to the probable cause determination because probable cause requires "objective" facts that are totally lacking here. The majority's "subjective" belief about what constitutes "good police work" has no bearing on the probable cause determination and cannot transform a "hunch" into probable cause. *See Terry,* 392 U.S. at 22, 88 S.Ct. 1868 (stating that "[i]f subjective good faith were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police").

Finally, there is no legal support for the majority's broad statement that Officer

Kading's "gut feeling" was "reasonable belief." The Supreme Court has clearly stated that gut feelings and inarticulable "hunches" do not equal reasonable suspicion, let alone probable cause. *Wardlow,* — U.S. at ——, 120 S.Ct. at 675–676; *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. Based on this well-established precedent, the majority's conclusory analysis is plain wrong.[1]

### B. Hot Pursuit

Although the lack of probable cause is a sufficient reason to reverse, there is a second, independent reason for reversing; namely, the officers were not in "hot pursuit." The doctrine of hot pursuit only applies when officers are in "immediate" and "continuous" pursuit of a suspect from the scene of a crime. *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091; *United States v. Salvador,* 740 F.2d 752, 758 n. 5 (9th Cir. 1984), *cert. denied* 469 U.S. 1196, 105 S.Ct. 978, 83 L.Ed.2d 980 (1985). The critical time for determining whether any exigency exists is the moment the officers make the warrantless entry into the defendant's home. *United States v. Lindsey,* 877 F.2d 777, 781 (9th Cir.1989).

Based on the record in this case, it is clear that the officers' pursuit of Smith was not "continuous." Officer Kading broke the continuity when he chose not to pursue Smith into the woods. Instead of continuing the chase, Officer Kading decided to radio for back-up assistance. While he was waiting, Officer Kading drove back down the highway to Smith's residence to retrieve the pepper spray canister he lost during his confrontation with Smith. By the time the back-up officers arrived and they decided to enter Johnson's property, no one had seen Smith for over a half

hour. Unless the "continuity" requirement is stretched beyond recognition, the facts of this case simply are not covered by the "hot pursuit" doctrine. The half-hour time period, during which the officers received no new information about where Smith had gone, turned the pursuit from lukewarm to ice cold.

The majority relies heavily on the fact that Officer Kading decided not to pursue Smith into the woods because he feared for his safety. In support, the majority cites to cases, including unpublished district court cases, where a half hour delay to wait for backup to arrive did not terminate the "hot pursuit." The distinguishing characteristic in all of these cases is that the police officers never lost sight of the suspect they were pursuing. The officers always knew exactly where the suspect was, but decided that it would be dangerous for them to enter the home until reinforcements arrive. *See e.g. Lindsey,* 877 F.2d at 779 (noting that when backup arrived, officers saw the suspect through the window of the house); *Griffin v. City of Clanton,* 932 F.Supp. 1359, 1367 (M.D.Ala. 1996) (concluding that hot pursuit still applied when backup arrived because officers at the scene "clearly had not lost [the suspect's] trail"). Under these circumstances, the "continuity" of the chase was delayed, but not broken. *See United States v. Lindsay,* 506 F.2d 166, 173 (D.C.Cir.1974) (stating that "[s]peed and continuous knowledge of the alleged perpetrator's whereabouts are the elements which underpin this exception to the warrant requirement").

In this case, however, the continuity of the chase was terminated permanently. Smith did not run into a confined area where Officer Kading could monitor his

---

1. The majority's attempt to distinguish the case of *United States v. Dawkins,* 17 F.3d 399, 404 (D.C.Cir.1994), is equally unpersuasive and contains a serious misstatement of law. In its analysis, the majority claims that unlike the officers in *Dawkins,* the officers in this case had probable cause because "no clues ... led [Officer Kading] to believe, conclusively, that Smith was somewhere other than Johnson's property." This statement, howev-

er, turns the probable cause test on its head. Police officers do not obtain probable cause to conduct a search in one place based on the lack of probable cause to search another place. They obtain probable cause because the facts indicate that they will find the item they are looking for in the place to be searched. *See Terry,* 392 U.S. at 22, 88 S.Ct. 1868. No such facts exist in this case.

movements while waiting for his backup to arrive. Smith ran into a wooded area where he was free to roam for over a half hour. Once the alleged "pursuit" resumed, the officers no longer had any idea where Smith was. Under these circumstances, the continuity of the chase was clearly broken and the officers had to obtain a warrant before searching the curtilage of Johnson's property. Although this requirement is clearly inconvenient to law enforcement, any other outcome renders the concept of "hot pursuit" meaningless and allows the police to conduct warrantless searches while investigating a suspect's whereabouts.

What makes the majority's finding even more egregious is its failure to follow the holding of *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). In that case, the Supreme Court clearly stated that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." *Id.* at 753, 104 S.Ct. 2091. Although the Court did not draw a bright line between felonies and misdemeanors, it cited favorably a number of cases that refused to permit warrantless entries of the home for "nonfelonious crimes." *Id.* at 752, 104 S.Ct. 2091. Based on these cases, the Court found that "application of the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has ben committed." *Id.* at 753, 104 S.Ct. 2091.

The reason that *Welsh* is important to the analysis of this case is because Smith was only wanted for misdemeanor offenses. Although this does not definitely preclude a finding of exigent circumstances, it weighs heavily against it. Curiously, the majority chooses to ignore this holding and instead cites Justice White's dissent in *Welsh* for the proposition that this type of analysis is inconvenient for the courts and could hamper effective law enforcement efforts. *Id.* at 760, 104 S.Ct. 2091 (White, J., dissenting).[2] Although Justice White's writings in *Welsh* are certainly interesting, a majority of the Supreme Court viewed that case differently. Until the majority opinion in *Welsh* is overturned, we are bound by that reasoning.

Perhaps recognizing this problem, the majority states that the underlying warrants are not the issue. Instead, the majority decides to focus on the unlawful conduct that gave rise to the initial chase, i.e., resisting arrest. The change of focus, however, is unavailing since under Washington law, resisting arrest is only a misdemeanor. *See* Wash. Rev.Code § 9A.76.040. As a result, the *Welsh* analysis would still apply.

In addition, the majority misses the central purpose of the *Welsh* analysis. No one is arguing that Officer Kading did not have a right to pursue Smith through the public streets after he resisted arrest. The question is whether the search can continue when it begins to encroach on a person's Fourth Amendment rights. Put differently, the question is whose interest should yield—a person's right to be free from warrantless intrusions or law enforcement's interest in apprehending a fleeing suspect. *See Brinegar,* 338 U.S. at 176, 69 S.Ct. 1302. In situations where an officer is truly in hot pursuit and the underlying offense is a felony, the Fourth Amendment usually yields. *See United*

---

**2.** Not only does the majority fail to follow precedent from the Supreme Court and this Circuit, but it is particularly annoying that it quotes language from my dissenting opinion in *United States v. Scott,* 520 F.2d 697, 701–703 (9th Cir.1975). In *Scott,* I argued that the "hot pursuit" exception to the warrant requirement did not apply to the facts of that case. *Id.* I stated that the hot pursuit doctrine should be construed narrowly and expressed my "fear" that the phrase "hot pursuit" had "been given a meaning well beyond what was intended." *Id.* at 701. I take the same position here. For the majority now to use that dissenting opinion to support their argument causes one to wonder whatever possessed them to do so.

*States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). However, in situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the "rarest" cases. *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091.[3]

Adding another wrinkle to this case is the fact that the officers encroached on the Fourth Amendment rights of a person who did not create the exigent circumstances. Here, it was Smith who created the alleged exigency when he resisted arrest. The officers, however, performed a warrantless search of the curtilage of Smith's neighbor's home (Johnson). Johnson's lack of involvement in the situation that created the exigency is another factor weighing against the reasonableness of the warrantless entry.

## II. *Conclusion*

The majority opinion disregards long standing principles underlying the Fourth Amendment. Therefore, I dissent.

---

**3.** The majority also claims that *Welsh* is distinguishable because the officers never went inside of Johnson's home. This statement, however, is irrelevant to our Fourth Amendment analysis. The Supreme Court has clearly stated that the "curtilage [is] considered part of the home itself for Fourth Amendment purposes." *Oliver v. United States,* 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Since the majority "assumes" that the area searched was part of the "curtilage" of Johnson's home, Johnson is entitled to the full protection of the Fourth Amendment.